**In re Glenn H. CARLSON & Diane E. Cafferty, Respondents.**

**No. 01–BG–994.**

District of Columbia Court of Appeals.

Argued June 4, 2002.

Decided July 3, 2002.

Ann Lake Bryant and William W. Nickerson, for respondent Cafferty.

Julia L. Porter, Senior Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before STEADMAN, RUIZ and REID, Associate Judges.

REID, Associate Judge:

The Board on Professional Responsibility ("the Board") has recommended the disbarment of respondent Diane E. Cafferty, who practiced law with Glenn H. Carlson as Carlson & Cafferty. The Board found that Mr. Carlson engaged in intentional misappropriation and other violations of the Rules of Professional Conduct ("the Rules"); he filed no exception to the Board's Report.[1] The Board recommended that Diane E. Cafferty be disbarred for conduct amounting to reckless

misappropriation and failure to render accountings promptly to clients upon request, but not for failure to deliver client funds promptly or for conduct manifesting dishonesty; she took exception to part of the Board's Report and Recommendation. Bar Counsel noted an exception to the Board's findings that Ms. Cafferty did not engage in conduct that was dishonest, and did not fail to promptly deliver funds due to her clients.

Ms. Cafferty contends that Bar Counsel failed to establish, by clear and convincing evidence, that she violated the Rules as charged. She argues, in part, that she did not recklessly misappropriate client funds or fail to render prompt accountings of client funds upon request, because (a) she never managed the accounts of the firm, including the client trust account, and (b) took actions related to the firm's accounts, including the client trust account, only at the express direction of Mr. Carlson. Ms. Cafferty also maintains that her due process rights were violated, in part, because of the alleged prejudicial consolidation of her case with that of Mr. Carlson. Bar Counsel argues that it presented clear and convincing evidence that Ms. Cafferty engaged in dishonest conduct and failed to promptly deliver funds to her clients, in addition to her other violations of the Rules.

We reject the contentions of Ms. Cafferty, and adopt the recommendation of the Board that Ms. Cafferty be disbarred for reckless misappropriation and failure to render accountings promptly to her condominium clients upon request.[2]

---

1. Since Mr. Carlson was already disbarred, see In re Carlson, 745 A.2d 257 (D.C.2000) (per curiam), the Board concluded that "no further sanction is necessary."

2. See note 12, infra, regarding Bar Counsel's exception to the Board's findings that Ms. Cafferty did not engage in conduct that was dishonest, and did not fail to promptly deliver funds due to her clients.

## FACTUAL SUMMARY

The record before us shows the following events. Bar Counsel filed the specification of charges against Ms. Cafferty on December 30, 1997. The specification alleged that:

[Ms. Cafferty's] conduct violated the following provisions of the Rules of Professional Conduct:

(a) Rule 1.15(a), in that [she] intentionally and/or recklessly (1) failed to hold property of one or more clients and/or third persons in her possession in connection with a representation separate from her own property (commingling) and/or (2) intentionally and/or recklessly misappropriated funds belonging to one or more clients and/or third persons.

(b) Rule 1.15(b), in that [she] failed to deliver to one or more clients funds that the clients were entitled to receive and/or promptly to render a full accounting regarding such funds upon request of one or more clients.

(c) Rule 8.4(b), in that [she] committed criminal acts (theft and fraud) that reflect adversely on her honesty, trustworthiness, or fitness as a lawyer in other respects; and

(d) Rule 8.4(c), in that [she] engaged in conduct involving dishonesty, fraud, deceit, and/or misrepresentation.

Mr. Carlson was charged with identical violations of the Rules. Following the filing of the specification of charges against Ms. Cafferty and Mr. Carlson, Bar Counsel moved to consolidate their cases because they arose out of Carlson & Cafferty's representation of owners of condominium units located at 1927 17th Street, N.W., ("the 17th Street condominium") in the District of Columbia. Ms. Cafferty opposed the consolidation on the ground that Mr. Carlson's case would "taint" her due to his conduct and his failure to cooperate with Bar Counsel. The Board determined that Ms. Cafferty would not be prejudiced by the consolidation, and "that in the interests of judicial economy and a coherent resolution of the charges against [Mr. Carlson and Ms. Cafferty], consolidation ... is appropriate."

Following consolidation, a hearing committee heard four days of testimony, in 1998, from witnesses for Bar Counsel and those for Ms. Cafferty.[3] Approximately two years after hearings were held, the hearing committee issued its Report, which the Board reviewed and modified.[4] The Board released its Report and Recommendation on July 31, 2001.

Documents in the record and the Board's Report reveal that in February 1985, during the last year of her law school studies, Ms. Cafferty worked as a law clerk at the firm of Kenny, Carlson & Warren. After her graduation from law school and admission to the Maryland Bar, Ms. Cafferty joined the firm as an associate; she worked almost exclusively for Mr.

---

3. Bar Counsel's five witnesses included three condominium unit owners who engaged the services of Ms. Cafferty and Mr. Carlson—Thomas E. Fritz, Timothy Lowe, and Stephen A. Thompson. Ms. Cafferty presented testimony from seven persons, including a former Carlson & Cafferty office manager, Andrea Hammond; a former partner of the law firm, Daniel P. Ferris; a former secretary of the firm, Patricia Ann Mast; a friend and client of the firm, JoAnna Turtletaub; and a client and former Congressman, the Honorable John Hall Buchanan.

4. The modifications responded to Ms. Cafferty's complaint that, in using the word "Respondents" in its Report, the hearing committee failed to distinguish her behavior from that of Mr. Carlson. Where appropriate, the Board substituted the name of either Ms. Cafferty or Mr. Carlson for "Respondents."

Carlson.[5] Around 1988, Mr. Carlson, Ms. Cafferty and Mr. Daniel Ferris left Kenny, Carlson & Warren and established their own firm, Carlson, Cafferty & Ferris.[6] Mr. Ferris managed the firm's client trust fund. The firm became Carlson & Cafferty after Mr. Ferris's departure to practice law in another jurisdiction, and Mr. Carlson assumed the position of managing partner.

The firm maintained a client trust fund at the Riggs Bank ("the Riggs Escrow Account"), an operating account at the First Liberty National Bank between March 1992 and September 1995, and an account for Commercial Quest, Inc. at Riggs Bank, which was used as an operating account beginning around September 1995. Ms. Cafferty served as President of Commercial Quest, "a separate business venture." Both Mr. Carlson and Ms. Cafferty had signatory authority on all of the firm's accounts. Ms. Hammond handled day-to-day management of the Riggs Escrow Account until she left the firm in 1993. The Board found that Ms. Cafferty "regularly transferred moneys between the Riggs Escrow Account and the various accounts maintained by the law firm, generally at the direction of [Mr.] Carlson."

Around May 1989, Thomas Fritz, owner of a condominium unit at the 17th Street condominium, contacted Ms. Cafferty and asked her to represent him in his dispute with his condominium association over services and repairs at the condominium complex. She agreed, and Mr. Fritz decided to send his monthly condominium fee payments of $148.33 to Carlson & Cafferty. These payments were made from around May 1989, through March 1996, and were sent with a letter addressed either to Ms. Cafferty, or to Mr. Carlson and Ms. Cafferty. Each transmittal specified that the check should be put into the law firm's escrow account. Commencing in early 1990, at least two other residents of the 17th Street condominium sent monies to the law firm; these funds also were earmarked for the firm's escrow account. Other persons connected to the 17th Street condominium transmitted funds to the firm for the escrow account.

In addition to making payments for the law firm's escrow account, Mr. Fritz and two other owners of condominium units in the 17th Street condominium retained Carlson & Cafferty under a contingency fee arrangement, in March 1991, to take legal action against the principal officer of the 17th Street condominium's management company. Approximately ten months after the lawsuit was filed, the parties entered into a settlement agreement, and the settlement funds were placed in the Riggs Escrow Account.

After settlement, Carlson & Cafferty continued to represent Mr. Fritz and other residents of the 17th Street condominium. In May 1992, Mr. Fritz and others retained the firm, at the hourly billing rate of $225, to "prepare and update all condominium documents and to take steps necessary to have the [condominium association] in full compliance with the law and all governing documents." Furthermore, when one of the persons whom the firm represented assumed responsibility for the management of the 17th Street condominium, bills of the condominium were sent to the firm for payment from escrow funds; some monthly condominium fees also were transmitted for deposit in the firm's escrow account.

---

5. Ms. Cafferty was admitted to practice in the District of Columbia in October 1986.

6. The three left the firm because one of the partners sought to use funds from the client trust fund to pay his rent.

After retaining the firm in May 1992, the 17th Street condominium clients began to request billing statements, bylaws, and information about services that the firm had rendered. Responses to oral and written requests made between May 1992 and December 1994 were delayed. One accounting was received in October 1993, and at a February 1994 condominium association meeting, attended by Ms. Cafferty and Mr. Carlson, amended bylaws were submitted, as well as an accounting for funds received and paid on behalf of the association since 1989. The accounting showed that "[Carlson & Cafferty] had received over $60,000[,] ... had expended approximately $40,000, including $11,948.86 paid to the firm in fees and expenses" and $21,000 remained in escrow. Following the February 1994 meeting, Mr. Fritz repeatedly asked the firm for additional accountings. An accounting was submitted in June 1995, and thereafter, no requested accounting was forthcoming until July 1997. By that time, two of the condominium clients had filed an ethical complaint against Mr. Carlson and Ms. Cafferty.

Around February and April of 1994, the Washington Federal Savings Bank, which had foreclosed on three of the 17th Street condominium units, began paying monthly condominium fees on these units to Carlson & Cafferty for deposit into the firm's escrow account. When the 17th Street condominium was sold around March 1996, Washington Federal Savings Bank asked Mr. Carlson to disburse the funds held in the Riggs Escrow Account. Mr. Carlson sent a letter to Washington Federal Savings Bank on March 25, 1996, agreeing to disburse funds, except for $3,000 to be retained for potential liabilities. After the sale closed, Mr. Fritz and others repeatedly requested disbursement of the Riggs Escrow Account funds. Mr. Carlson did not honor these requests in a timely manner, undoubtedly because there were insufficient funds in the escrow account.[7] In fact, the Board found that:

> By the Summer of 1996, when Carlson & Cafferty were required to disburse to the condominium owners the more than $40,000 that they had received to hold in trust, only approximately $2,000 of the funds remained in the Riggs Escrow Account. The missing funds of the [condominium association] had been used by [Mr. Carlson and Ms. Cafferty], without their clients' knowledge or consent, to pay themselves and other payees unrelated to the [condominium association], at times when the balance in the Riggs Escrow Account had fallen below the amount that [Mr. Carlson and Ms. Cafferty] were required to hold in trust for the [condominium association].

The reason for the shortage of funds in the escrow account is that beginning around April 1992, and continuing to around September 1995, Mr. Carlson and Ms. Cafferty commingled the Riggs Escrow Account funds with other accounts and used the escrow funds for purposes not associated with the affairs of the condominium clients or the condominium asso-

7. Mr. Carlson repeatedly gave misleading and inaccurate accountings to the condominium clients, which overstated the balances actually held in the Riggs Escrow Account. For example, in June 1995 his accounting to the clients reflected an escrow balance of $37,474.41 when only $32,854.17 remained in the account; and in December 1996, his accounting to the clients specified a balance of $40,536.05, even though only $1,875.00 was left in the account. Although she knew that Mr. Carlson was presenting accountings to the condominium clients, the Board determined that "[Ms.] Cafferty never looked at the bank statements for the Riggs Escrow Account or otherwise checked the balances in the Riggs Escrow Account ...."

ciation. During the 1992 to 1995 period, "numerous checks" that Mr. Carlson and Ms. Cafferty wrote on their First Liberty National Bank operating account were dishonored due to insufficient funds. The Board found that bank records for the operating account "reflect[ed] only three monthly periods in which the account was not overdrawn." The Board also determined that: "[Mr.] Carlson and [Ms.] Cafferty regularly wrote checks using funds from the Riggs Escrow Account to pay firm expenses at times they both knew that the law firm had a shortage of funds in its operating account at First Liberty Bank."

After the bank closed Carlson & Cafferty's operating account, Mr. Carlson and Ms. Cafferty "transferred thousands of dollars in funds from the Riggs Escrow Account to the Commercial Quest account," and began to use that account as its operating account. Between September 1995, and December 1995, $35,425.30 was deposited into the Commercial Quest account, and less than $1,000 of that sum was traceable to a source other than the Riggs Escrow Account. During the September to December 1995 period, Mr. Carlson did not spend much time in Carlson & Cafferty's office and did not attend to the affairs of the law firm. Consequently, "[Ms.] Cafferty signed many of the checks that were drawn on the Riggs Escrow Account that transferred these funds" to the Commercial Quest account.[8]

Even before the close of Carlson & Cafferty's First Liberty National Bank oper-

ating account, Mr. Carlson and Ms. Cafferty were using funds from the Riggs Escrow Account to pay themselves and office expenses. Bank records revealed that this practice began around November 1991 and continued through 1996, and into 1997. Indeed, some 94 checks signed by Ms. Cafferty in 1995 alone, were written on the Riggs Escrow Account and were made payable to "cash" in sums ranging from $50.00 to $7,615.06.[9] Funds from one "cash" check for $678.00 were used to pay a Carlson & Cafferty employee's rent.

Funds deposited in the Commercial Quest account, which included monies transferred from the Riggs Escrow Account, also were used by Mr. Carlson and Ms. Cafferty for cash purposes. During the period September to December 1995, Ms. Cafferty wrote checks to cash on the Commercial Quest account which totaled $3,294.15.

When she testified before hearing committee Number Five, Ms. Cafferty was asked about the checks made out to "cash" that she wrote on the Riggs Escrow Account. She replied:

> Well, . . . [Mr.] Carlson told me to take the cash out of the account; that he had plenty of money in the account. . . . If the operating account were low, he'd say take the money out of that and put the cash in the operating account so that it gets credited immediately.

She denied taking any of the condominium clients' funds, "to [her] knowledge." Instead, "she maintained that funds for the checks made out to cash came out of Mr.

---

8. According to the Board's factual findings, Mr. Carlson's inattention to the affairs of the firm actually extended for a longer time span:
   For a period of time beginning in 1994 and continuing at least through 1996, [Mr.] Carlson was drinking quite heavily. He was also traveling a great deal to California and was not attending to the business of the . . . law firm, which was being handled

primarily by [Ms.] Cafferty. During this period [Mr.] Carlson physically abused [Ms.] Cafferty on more than one occasion.

9. Ms. Cafferty's practice of writing checks on the Riggs Escrow Account to "cash" apparently began in December 1991, and continued every year thereafter until mid–1996.

Carlson's father's estate money."[10] She thought that Mr. Carlson "had an abundance of money." She also asserted that at the time, Mr. Carlson had obtained about $39,000 from his wife to put into the account.

Ms. Cafferty acknowledged during her testimony before the hearing committee that one of the reasons Mr. Carlson, Mr. Ferris and she left their prior firm was because an attorney in that firm sought to use money from a client trust account to pay office expenses. She admitted knowing "that [such use] was wrong at the time[.]" She also confirmed that she had personally deposited some of the condominium clients' money into the firm's client escrow account periodically. When Bar Counsel inquired whether she paid herself "compensation out of the [client] trust account," she responded:

> Yes. When [Mr. Carlson] had his money in there, and I needed to get paid, he would say write it for cash, and he was loaning it to the firm from his money.

She added that she "always thought that there were trusts within trusts that were theoretically insulated from one another."

By June 1997, Carlson & Cafferty still had not presented a final accounting to the condominium clients, and had not disbursed the condominium association funds that were supposed to be in the Riggs Escrow Account. Therefore, two of the condominium clients filed an ethical complaint against Carlson & Cafferty. Mr. Carlson informed Ms. Cafferty of the shortage of funds in the Riggs Escrow Account, but stated that he would obtain $39,000 from his wife to replace the funds. He put the funds from his wife, as well as smaller sums, into an account that he had opened in July 1997 at the First Liberty

National Bank, to bring the Liberty account up to $40,624.39. Then he deposited $40,536.05 of that amount in the Riggs Escrow Account, and paid that sum to the condominium clients and the Washington Federal Savings Bank.

## ANALYSIS

We begin with Ms. Cafferty's assertion that the Board failed to show by clear and convincing evidence that she recklessly misappropriated client trust funds, since Mr. Carlson was the sole manager of the Riggs Escrow Account and her actions relating to that account were taken only in accordance with his directives. We reiterated our standard of review governing a report and recommendation of the Board in *In re Berryman*, 764 A.2d 760, 766 (D.C.2000). We emphasized our limited scope of review, and our obligation both to " 'accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and [to] adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.' " *Id.* (quoting D.C. Bar R. XI, § 9(g) (other citations omitted)). However, the question whether Ms. Cafferty recklessly misappropriated client funds is a legal question which we review *de novo*. *Id.* (citing *In re Utley*, 698 A.2d 446, 449 (D.C.1997)).

█ We repeated our definition of "misappropriation" in *In re Anderson*, 778 A.2d 330 (D.C.2001) "as 'any unauthorized use of client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [she] derives

---

**10.** Based upon Ms. Hammond's testimony, the Board concluded that Mr. Carlson inherited "about $20,000 from his father's estate."

any personal gain or benefit there-from.'" [11] *Id.* at 335 (quoting *In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983) (citation and quotation marks omitted)). In discussing who has the burden of proof in misappropriation cases, we held that: "Bar Counsel must prove unauthorized use of client funds by clear and convincing evidence." *Id.* (referencing *In re Gilchrist,* 488 A.2d 1354, 1357 (D.C.1985)). We declared, however, that:

> In the case of misappropriation ... [the] proof requirement is not a demanding one, because misappropriation occurs whenever
>
> > the balance in [the attorney's escrow] account falls below the amount due to the client. Misappropriation in such situations is essentially a per se offense; proof of improper intent is not required.

*Id.* (quoting *In re Micheel,* 610 A.2d 231, 233 (D.C.1992)) (citations omitted).

Because of the seriousness of a misappropriation offense, we have adhered to a standard of presumptive disbarment since 1990, except in cases of negligent misappropriation, or extraordinary circumstances. As we said in *In re Addams,* 579 A.2d 190 (D.C.1990) (en banc):

> We now reaffirm that in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence. While eschewing a *per se* rule, we adhere to the presumption laid down in our prior decisions and shall regard a lesser sanction as appropriate only in extraordinary circumstances.

*Id.* at 191. Misappropriation cases decided after *In re Addams, supra,* generally have fallen into three categories: (1) intentional misappropriation, (2) reckless misappropriation, and (3) negligent misappropriation. The principle of presumptive disbarment generally is applied in intentional and reckless misappropriation cases, but not in matters of negligent misappropriation.

Ms. Cafferty argues that if her case falls into any of these categories, it is the negligent misappropriation category, which would, at most, merit a six month suspension. In contrast, the Board found that her actions constituted reckless misappropriation, and that disbarment is the appropriate sanction. Our review of the record in this matter reveals clear and convincing evidence that Ms. Cafferty recklessly misappropriated client funds.

Based in part upon our past opinions, we recently clarified the offense of reckless misappropriation in *In re Anderson, supra.* We stated that:

> [T]he central issue in determining whether a misappropriation is reckless is *how* the attorney handles entrusted funds, whether in a way that suggests the unauthorized use was inadvertent or the result of simple negligence, or in a way that reveals either an intent to treat the funds as the attorney's own or a conscious indifference to the consequences of his [or her] behavior for the security of the funds.

778 A.2d at 339 (referencing *In re Micheel, supra,* 610 A.2d at 236 (other citations omitted)). In examining how the attorney handled entrusted funds, and whether reckless misappropriation has occurred, we look for "a pattern or course of conduct demonstrating an unacceptable disregard for the welfare of entrusted funds, such as [1] the indiscriminate commingling of en-

---

11. "Our misappropriation rule 'does not require scienter; rather, it is essentially a per se offense.'" *In re Berryman, supra,* 764 A.2d at 768 (quoting *In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983)).

trusted and personal funds, [2] the failure to track settlement proceeds, [3] the disregard of the status of accounts into which entrusted funds were placed, or [4] permitting the repeated overdraft condition of an account." *Id.* Two other factors may also indicate recklessness: "[1] the indiscriminate movement of monies between accounts and [2] the disregard of inquiries concerning the status of funds." *Id.* at 338. (References omitted).

Contrary to the situation in *In re Anderson, supra,* which involved a discrete or single act of misconduct and a finding of negligent misappropriation, the record before us reveals clear and convincing evidence that Ms. Cafferty herself engaged in "a pattern or course of conduct demonstrating an unacceptable disregard for the welfare of entrusted funds," *see Anderson, supra,* 778 A.2d at 339, sent to Carlson & Cafferty by their 17th Street condominium clients. This pattern extended over several years, including substantial periods of time in which Mr. Carlson was not paying attention to the affairs of the firm, thus calling into question Ms. Cafferty's insistence that she acted only at the direction of Mr. Carlson, and that the entire blame for the misappropriation falls squarely on him. While there was insufficient evidence to conclude that Mr. Anderson engaged in reckless misappropriation and related violations involving a single failure to pay a client's medical bill from settlement funds, we stressed that: "If in fact [Mr.] Anderson ignored or willfully blinded himself to . . . reminders [by the client that the bill had not been paid], then we would have no difficulty sustaining the [hearing committee's] determination of recklessness." *In re Anderson, supra,* 778 A.2d at 341. That is precisely the situation in this case. Ms. Cafferty ignored repeated requests by the 17th Street condominium clients for an accounting of client trust funds. She also willfully blinded herself to

Mr. Carlson's improper transfer of funds from the Riggs Escrow Account to Carlson & Cafferty's operating accounts, as well as to the consequences of her own improper use of the Riggs Escrow Account by writing checks to "cash" for personal payments. As the Board noted in another reckless misappropriation case, "[t]his is not a case where all of the conduct resulting in a misappropriation was caused by someone else." *In re Gregory,* 790 A.2d 573, 578 n. 1 (D.C.2002). Indeed, the record clearly and convincingly demonstrates Ms. Cafferty's active and reckless involvement in the misappropriation of client trust funds.

Ms. Cafferty was a signatory on the firm's accounts, including the Riggs Escrow Account. She was well-attuned to the impropriety of using client funds to pay for personal expenses, and she had left a prior firm because a partner had engaged in the practice. Nonetheless, bank records reveal that at least from late 1991, and continuing through mid–1996, Ms. Cafferty personally wrote numerous checks on the Riggs Escrow Account that were made out to cash, in amounts ranging from $50.00 to $7,615.06. During this period of time, Carlson & Cafferty's operating account at the First Liberty National Bank was overdrawn repeatedly, to such an extent that the bank closed the account in 1995. To create another operating account, Mr. Carlson and Ms. Cafferty transferred thousands of dollars from the Riggs Escrow Account to the Commercial Quest, Inc. account, designed initially for a business venture headed by Ms. Cafferty. The Board specifically found that "[Ms.] Cafferty signed many of the checks that were drawn on the Riggs Escrow Account that transferred these funds" to the Commercial Quest account, despite the fact that she personally deposited some of the funds sent to the law firm by the 17th Street

condominium clients into the escrow account and thus knew that the Riggs Escrow Account contained client trust funds. After transferring funds from the escrow account to the Commercial Quest account, Ms. Cafferty wrote checks out to "cash" on that account in the amount of $3,294.15. By mid–1996, when the condominium clients were seeking disbursement of approximately $40,000.00 in client trust funds, less than $2,000.00 remained in the Riggs Escrow Account.

Furthermore, Ms. Cafferty acknowledged that she even paid herself with funds from the Riggs Escrow Account, but again sought to shift the blame to Mr. Carlson. As she asserted during her testimony before the hearing committee, in response to a question about her receipt of compensation from the client trust fund: "When [Mr. Carlson] had his money in there, and I needed to get paid, he would say write it for cash, and he was loaning it to the firm from his money."

■■ Ms. Cafferty wrote checks on the Riggs Escrow Account, made out to cash, when she knew about requests from the condominium clients for accountings. She attended meetings of the 17th Street condominium association and became aware that repeated requests had been made for an accounting of the client trust funds. Even though she may not have prepared or seen the reports, she was present at the condominium association meetings when inaccurate and misleading accounting reports were distributed to her clients. She also knew that she and Mr. Carlson were the only lawyers in the firm; that personal funds from Mr. Carlson were being placed in the client trust fund; and that beginning in or around 1994, Mr. Carlson was not paying proper attention to the affairs of the law firm due to personal problems, including protracted problems with his marriage and heavy drinking, leaving substantial responsibility for the affairs of the firm to her. Yet, she took no steps to ensure the "safety and welfare of entrusted funds." *In re Anderson, supra,* 778 A.2d at 338. Instead, she personally displayed "an unacceptable disregard for the security of the client funds," *id.* (citation omitted), and "a conscious indifference to the consequences of [her] behavior for the security of the[se] funds[,]" *id.* at 339 (reference omitted). In short, her actions relating to the Riggs Escrow Account were not inadvertent or negligent.[12] Rather,

12. We reviewed our negligent misappropriation cases in some detail in *In re Berryman, supra,* 764 A.2d at 770–72, and need not reiterate what we said there. Suffice it to say here that our negligent misappropriation cases generally have involved single, or discrete, inadvertent or negligent acts. *See In re Travers,* 764 A.2d 242 (D.C.2000) (respondent paid a legal fee to himself with the consent of the heirs of the estate, but without the then required approval of the probate court); *In re Reed,* 679 A.2d 506 (D.C.1996) (inexperienced personal injury attorney inadvertently failed to pay a doctor's bill); *In re Choroszej,* 624 A.2d 434 (D.C.1992) (negligent failure to pay a doctor's bill). Ms. Cafferty attempts to analogize her situation to that of the respondent in *In re Fair,* 780 A.2d 1106 (D.C.2001), arguing that: "[T]here is nothing in the record here to support the notion that [she] was 'consciously indifferent' to the concerns of the firm's clients, including those relating to entrusted funds." Rather, she continues: "The record is replete with credible, uncontroverted testimony that [Ms.] Cafferty was almost consumed with concern for and dedication to her clients." Ms. Cafferty's reliance on *In re Fair* is misplaced. The respondent there took a $6,600 legal fee in six checks without prior court authorization, and overpaid herself by approximately $600. Ms. Fair received a fourteen month suspension. Ms. Fair's case contained "perplexing aspects." *Id.* at 1111. The legislature changed the prior court approval requirement within less than a year after Ms. Fair's actions. In addition, there was testimony from a probate expert who provided details about the "probate culture" that led to Ms. Fair's actions. *Id,* at 1111–12. And, the record regarding Ms. Fair's record-

the record contains clear and convincing evidence that she recklessly misappropriated client trust funds. The record also supports the Board's determination that Ms. Cafferty failed to render accountings promptly to her condominium clients upon request. She attended meetings of the condominium association, including one in February 1994, and many of the written requests for accountings were addressed to her. Hence, Ms. Cafferty was aware of the requests for accountings, but made no effort to see that they were rendered in a timely fashion. For example, despite repeated requests, after the delayed submission of an accounting in June 1995, for an additional accounting, none was forthcoming until two of the condominium clients filed an ethical complaint against Mr. Carlson and Ms. Cafferty. Thus, the record contains clear and convincing evidence that Ms. Cafferty failed to render accountings promptly to her condominium clients upon request.

■ Ms. Cafferty's remaining contentions are unpersuasive, and we dispose of them summarily. We discern no violation of her due process rights due to consolidation of her case with that of Mr. Carlson. The cases were properly consolidated in the interest of judicial economy since they arose out of Mr. Carlson's and Ms. Cafferty's representation of their 17th Street condominium clients, and there was no indication that Ms. Cafferty would be prejudiced by the joinder. *See In re Reback,* 513 A.2d 226 (D.C.1986). Moreover, the

record reveals that no prejudice in fact accrued to Ms. Cafferty due to the joinder of her case with Mr. Cafferty's. Mr. Carlson never appeared at the hearing, although he was represented by counsel. In addition, the Board reviewed the Report of the hearing committee thoroughly and modified factual findings, as necessary, to distinguish Ms. Cafferty's behavior from that of Mr. Carlson. We are also satisfied, based upon our review of the record, that the Board considered and properly weighed the testimony of Ms. Cafferty's witnesses. Finally, Ms. Cafferty's argument that she was denied due process because the hearing committee did not submit its report within sixty days after her hearing concluded [13] is futile in light of our decision in *In re Morrell,* 684 A.2d 361 (D.C.1996). There, we "presume[d] that the [sixty day] rule is directory, rather than mandatory." *Id.* at 370 (reference omitted). We added that: "It would hardly serve the integrity of the bar, moreover, to allow Morrell to avoid the imposition of discipline for his serious ethical violations merely because the Hearing Committee took a long time carefully evaluating the substantial, complex evidence in this case." *Id.* The same is true in Ms. Cafferty's case. In summary, we see no due process violation, where Ms. Cafferty has not demonstrated prejudice resulting from the delay.

Accordingly, for the foregoing reasons, we accept the Board's recommendation that Ms. Cafferty be, and she hereby is disbarred from the practice of law in the District of Columbia, effective thirty days

---

keeping duties was deemed to be "thin." *Id.* at 1113. Thus, in contrast to Ms. Cafferty's case where there is substantial record evidence to support the Board's findings, the record in *In re Fair* was "insufficient to show by the requisite clear and convincing evi-

dence," *id.* at 1115, that the respondent there acted with a " 'conscious indifference to the consequences' " of her action, *id.* at 1115 (quoting *In re Anderson, supra,* 778 A.2d at 339).

**13.** *See* D.C. Bar R. XI, § 9(a).

from the date of this opinion.[14]

*So ordered.*

---

**14.** We deem it unnecessary, and do not consider Bar Counsel's contentions that Ms. Cafferty engaged in dishonest conduct, and failed to promptly deliver funds due to her condominium clients, because her violations of Rules 1.15(a) and 1.15(b) support the Board's recommendation of disbarment. Those contentions may be addressed, if necessary, in considering a petition for reinstatement.