**In re Lewis A. RIVLIN, Respondent,**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 02–BG–1178.**

District of Columbia Court of Appeals.

Submitted May 7, 2004.
Decided Aug. 5, 2004.

Before STEADMAN, SCHWELB, and WASHINGTON,* Associate Judges.

PER CURIAM:

 The Board on Professional Responsibility ("Board") has unanimously recommended that respondent Lewis A. Rivlin, a

---

* Judge Glickman was a member of the division at the time this case was submitted. He later withdrew from the case, and Judge Washington was chosen by lot to replace him.

member of our Bar, be disbarred. The Board found that Respondent intentionally or recklessly misappropriated thousands upon thousands of dollars entrusted to him. In *In re Addams*, 579 A.2d 190, 191 (D.C.1990), the en banc court set forth the principle applicable here: "We now reaffirm that in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." We have adhered firmly to that position. Indeed, the case before us presents the aggravating factor of a campaign of noncooperation and affirmative frustration of Bar Counsel's inquiry, culminating with an order of this court finding Respondent in civil contempt and ordering imprisonment.[1]

We see no need to duplicate in this opinion the details of Respondent's course of conduct. That has been done in a painstaking forty-five page report of the Board. We have annexed portions of the text of both the findings of fact and the analysis contained in the report. We can find no fault in either.

■ In Bar Counsel's correct characterization, "Respondent's principal contention [in his brief to us] is that the Court should adopt his version of events and reject the findings of the Hearing Committee and Board. In reciting his version of events, Respondent ignores the overwhelming evidence that supports the hearing Committee's and Board's findings." In a bar disciplinary proceeding, as with other appellate matters, this court is no place to reargue the facts. On the contrary, "we are required to 'accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *In re Johnson–Ford*, 746 A.2d 308, 310 (D.C.2000) (citing D.C. Bar R. XI, § 9(g)(1)). The findings are supported by substantial evidence and the recommended disposition is squarely in accord with precedent.[2] Accordingly, it is

ORDERED that Lewis A. Rivlin be, and he hereby is, disbarred from the practice of law in the District of Columbia. We direct respondent's attention to the affidavit requirement of D.C. Bar Rule XI, § 14(g) and its effect on his eligibility for reinstatement. *See* D.C. Bar Rule XI,

1. Respondent was also found by the Hearing Committee to have violated Rule 7.5 (misleading communications about a firm partnership) for using letterheads that listed lawyers who were not practicing law with him or who had not entered into a partnership agreement. The Board, however, did not explicitly address this alleged violation in the analysis section of its report. Since any such violation would not affect the discipline imposed in this case, we do not consider it further.

2. Respondent argues that certain documents were erroneously excluded from evidence, but in the main does not specify how or when these documents were offered to either the Hearing Committee or the Board. He does argue that certain "amicus briefs," which take the form of unsworn affidavits, should have been accepted by the Board, but the proffer came long after the record had closed and the Board was under no obligation to accept them. Board Rule 12.1(c).

Respondent also assigns as error the Hearing Committee's decision to permit a witness to testify via telephone from England. He claims that this deprived him of the opportunity to confront the witness with certain unspecified documents and kept the Committee from being able to observe the witness' demeanor. There is nothing in the record to indicate that Rivlin raised this argument to the Board. *See In re Cohen*, 847 A.2d 1162, 1167 n. 3 (D.C.2004) (issues not presented to the Board for review are not preserved for appeal). Furthermore, he "was given a full opportunity to refute this evidence." *In re Kennedy*, 605 A.2d 600, 603 (D.C.1992).

§ 16(c). Any reinstatement shall be further conditioned upon a showing of repayment of misappropriated funds with interest thereon.

APPENDIX

## II. *FINDINGS OF FACT*

### A. *General*

1. Respondent is a member of the Bar of the District of Columbia Court of Appeals, having been admitted to the Bar of the United States District Court for the District of Columbia on October 21, 1957.

### B. *Bar Docket No. 436–96: Count One*

#### (Commingling/Failure to Maintain Complete Records/Dishonesty)

2. Between June 1995 and September 1996, Respondent practiced with the law firm of Johnston, Rivlin & Foley, L.L.P. In addition to the law firm's operating and escrow accounts, Respondent maintained a separate, personal escrow account in his own name at NationsBank. The account, No. 20–86621406, was titled "Lewis A. Rivlin, Lawyer's Trust Account." ("NationsBank Trust Account"). Respondent's escrow account predated and postdated his affiliation with Johnston, Rivlin & Foley.

3. By at least June 1995, Respondent was using his NationsBank Trust Account as a business and personal account as well as an account for the deposit of client funds, including funds entrusted by third parties to Respondent. Respondent frequently referred to this account as his "triage" account.

4. During 1995 and 1996, Respondent deposited the following entrusted funds into his NationsBank Trust Account:
 a) $3,000,000 provided by Piedmont Resolution, L.L.C.;
 b) Funds from Anglo–Nordic for trading in bank debentures;
 c) Funds entrusted to Respondent by investors in Am–C.A.R.

Trading Corporation ("Am–C.A.R."). (In his solicitation to Am–C.A.R. investors, Respondent stated that their funds would be held in his lawyer's trust account.)

5. In addition to these various funds held by him in trust in his NationsBank Trust Account, Respondent deposited into the account:
 a) Earned fees, including a $28,000 check from client Summit Management Corp.;
 b) Funds from his wife's personal account;
 c) Funds from his personal account;
 d) Checks payable to Respondent as Trustee for Benjamin Rivlin;
 e) Checks from his law firm received as compensation;
 f) Funds provided by friends as "loans" or "assistance"—to Respondent, to transfer to other clients, to pay Respondent's rent, and for his other personal purposes.

6. Respondent used his NationsBank Trust Account to pay his business and personal expenses, including drafting checks to himself, his wife, his ex-wife, cash, Giant Food, PEPCO, Washington Gas, Hechingers, Capitol One, parking, his attorneys, Radio Shack, the IRS, Maryland's Comptroller of the Treasury, the District of Columbia Bar, the National Association of Criminal Defense Lawyers (his landlord as of July 1997), Texaco, his law firm, Publishers Clearing House, J.C. Penny, Sears, and the Sports Authority.

7. Respondent wrote numerous checks on his NationsBank Trust Account when there were insufficient funds to cover the checks. From June 1995 to February 1998, the Account was overdrawn on more than forty occasions. Bank statements show thirteen overdrafts between June 1995 and November 1996. The bank sent overdraft notices to Respondent for fifteen

checks drawn on insufficient funds between November 1996 and January 1997. More than a dozen overdrafts occurred between October 1997 and February 1998.

8. Notwithstanding NationsBank's frequent notices to Respondent when there were overdrafts, Respondent continued to write checks on his trust account when there were insufficient funds. This continued for more than a year after Bar Counsel opened its investigation into Respondent's overdrawing of his trust account. Respondent testified that he "didn't see any reason to change. If I was already doing something wrong, it couldn't make it much wronger to continue doing it."

9. For at least during the mid–1995 to mid–1998 time period that Respondent continued to use his NationsBank Trust Account for his personal and business affairs, Respondent had millions of dollars in judgments against him. These judgments included a $4—5 million judgment against Respondent by investors in Coaxial Systems, a $1 million judgment by Anglo–Nordic, a $300,000 judgment by a Mr. Lowe, and other judgments. In addition, the IRS had tax liens against Respondent.

10. Respondent was served in 1997 and 1998 with subpoenas by Bar Counsel to produce complete records of the funds deposited into his NationsBank Trust Account—records which he was required to maintain. Respondent claimed that he had such records, but searching for them was not a "very high priority" as Bar Counsel had already obtained his bank statements from NationsBank.

C. *Bar Docket No. 436–96: Count Two*

(Misappropriation)

11. In early 1996, Proforma Partners, through its general partners Paul Weinstein and G.W. Munn, retained Respondent in connection with potential litigation in Virginia.

12. In February 1996, attorney Edgar Browder introduced Respondent to Ambassador Henry Koba of the Central African Republic (C.A.R.). Respondent, the Ambassador and others discussed the possibility of starting a company to purchase diamonds and gold in the C.A.R. for resale. On February 22, 1996, Respondent had Am–C.A.R. incorporated in Delaware.

13. On March 1, 1996, Respondent received and deposited into his NationsBank Trust Account an $8,000 check from Ray Zimmerman as an investment in the gold and diamond trading venture in the C.A.R. Zimmerman, who had been introduced to Respondent by Paul Weinstein, was at the time the Vice President of the Investment Banking Department of DeMachy Worms & Company in Paris.

14. Mr. Zimmerman wrote a check payable to Respondent's NationsBank Trust Account, with such funds to be held pending the preparation of the necessary paperwork for Am–C.A.R. and the collection of additional funds. When Zimmerman delivered his funds to Respondent, he was not sure whether he was investing in a corporation, a partnership or a limited partnership.

15. In early March 1996, Respondent asked his firm's client, Paul Weinstein, to invest in the venture to purchase and resell gold and diamonds in the C.A.R. In a general letter received by Mr. Weinstein that was written on Respondent's law firm letterhead, Respondent advised that his firm was counsel to the Embassy of the C.A.R. and that they had been asked to organize the sale of diamonds and gold through the newly formed Am–C.A.R. Respondent wrote that he was Chairman of the Board of the new company and that Madame Juliette Koba, the wife of the C.A.R. Ambassador to the United States, was the company's president. He further advised that the company's cash, at least

initially, would be kept in his lawyer's trust account. Following his signature on this general letter, Respondent added:

Please note that, despite the stationery used, this is not an authorized or endorsed activity of the firm, and that the firm has no knowledge of the details of this project or of the truth or falsity of the representations I make herein.

16. Mr. Weinstein discussed his possible investment with Mr. Zimmerman. They concluded that investing as limited partners offered more advantages than purchasing stock in a corporation. Mr. Zimmerman told Respondent that he wished to invest as a limited partner. Mr. Zimmerman was present when Mr. Weinstein communicated this same condition to Respondent.

17. Respondent agreed to structure the transaction so that Weinstein and Zimmerman would invest as limited partners and Am–C.A.R. would be the general partner.

18. Mr. Weinstein considered Respondent to be acting as his attorney in this investment. He agreed to transfer his funds to Respondent's trust account pending the completion of the limited partnership agreement that Respondent had agreed to prepare for him. Mr. Weinstein viewed Respondent as his attorney and trusted Respondent.

19. Respondent did not advise Mr. Weinstein that he was not acting as his attorney or of his potential conflicts of interest by virtue of his representations of the Kobas, the Embassy of the C.A.R. and Am–C.A.R., as well as his own personal interests and/or involvement in the transaction, although he did advise Mr. Weinstein of these facts.

20. In March 1996, Mr. Weinstein agreed to invest $48,000 in the gold and diamond venture. These funds were to be transferred into Respondent's Nations-Bank Trust Account where Respondent agreed to hold them.

21. Shortly thereafter, Respondent advised Mr. Weinstein that he was sending Madame Koba to the C.A.R. to purchase a small amount of gold and/or diamonds as a test to see if the venture could be successful. On March 6, 1996, Respondent provided Madame Koba $24,000 in cash from the NationsBank Trust Account for this trip.

22. Mr. Weinstein was advised by Respondent that he should deliver to Madame Koba 100,000 French francs, representing $20,000 of his $48,000 investment, when Madame Koba stopped in Paris on her way the C.A.R. Madame Koba received these funds from Mr. Weinstein. On her return to Washington, she delivered more than 27,000 in French francs to Respondent, which he deposited in the NationsBank Trust Account in mid-April 1996.

23. Before Mr. Weinstein sent the remaining $28,000 of his investment, he confirmed by letter dated March 12, 1996, that his investment was to be made into a limited partnership. He wrote:

Proforma Partners is sending you [$]20,000 today which makes a total of $40,000 so far. When you create the limited partnership, the interests should be registered to Rive Droite, Inc., a Liberian Corporation.

24. On March 13, 1996, Mr. Weinstein wired $8,000 to Respondent's NationsBank Trust Account. On or about March 22, 1996, Mr. Weinstein forwarded a check for $20,000, drawn on a Proforma Partners account, made payable to "Lewis A. Rivlin, Esquire, Attorney Trust Account." This check was deposited to the NationsBank Trust Account on or about March 26, 1996.

25. Periodically, Respondent assured Mr. Weinstein he was working on the lim-

ited partnership agreement. In a letter dated August 25, 1996, Respondent advised Mr. Weinstein how he could not take a certain trip because he was busy with, among other things, the "rewrite and effectuation of the limited partnership shift [sic] for Am–C.A.R."

26. Respondent never provided Mr. Weinstein or Mr. Zimmerman with a limited partnership agreement or any other document reflecting their investment in Am–C.A.R.

27. In the latter part of 1996, Mr. Weinstein advised Respondent that he was no longer interested in investing in the Am–C.A.R. Venture and requested that his funds be returned to him.

28. Respondent could not return Mr. Weinstein's funds, because he had taken and used them by the beginning of May 1996.

29. On February 29, 1996, one week after Am–C.A.R. was incorporated, Respondent's NationsBank Trust Account had $18.25 in it. In March 1996, $89,966 was deposited into his NationsBank Trust Account, all but $966 of which was from investors in Am–C.A.R. Of this $89,966, $28,000 was from Mr. Weinstein's investment, and $8,000 was from Mr. Zimmerman's investment; $53,000 was from other investors, and $966 was a reimbursement of expenses, from one of Respondent's clients.

30. In April, Respondent deposited $50,802.25 into his NationsBank Trust Account. Two deposits totaling $27,315.03 reflected the French francs Madame Koba had delivered to Respondent upon her return from the C.A.R.—of which $20,000 was from Mr. Weinstein. The remainder of the deposits consisted of a $20,000 fee from a client and checks from Respondent's law firm.

31. Respondent began to use some of the Am–C.A.R. investors' money for his own purposes shortly after it was deposited in the NationsBank Trust Account in March 1996. Among the checks Respondent wrote on the NationsBank Trust Account during March 1996 were the following:

a) a $500 check dated March 7, 1996, payable to Respondent's law firm;

b) a $1,500 check dated March 8, 1996, payable to cash and endorsed by Respondent;

c) a $15,500 check dated March 15, 1996, payable to the Embassy of Central African Republic to pay its telephone bill and other bills;

d) a $3,000 check dated March 15, 1996, payable to Diane Farrington, Respondent's wife;

e) a $775.94 check dated March 12, 1996, payable to Bell Atlantic for Respondent's personal telephone bill;

f) a $2,500 counter check dated March 14, 1996, payable to cash and endorsed by Respondent;

g) a $2,075 counter check dated March 19, 1996, payable to cash and endorsed by Hala Ali–Sabeh, who at the time was a receptionist at Johnston, Rivlin & Foley;

h) a $2,075 counter check dated March 21, 1996;

i) a $250 check dated March 29, 1996, payable to Respondent.

32. By May 1, 1996, Respondent had transferred or used all the funds in his NationsBank Trust Account, including Mr. Weinstein's $48,000 that had been placed in the trust account. On May 1, 1996, the balance stood at $666.65; by the end of May 1996, the account had a negative balance.

33. In mid-April 1996, Respondent opened a separate account for Am–C.A.R.

at NationsBank, account no. 19–3321–2375. There was little activity in the account, and the total deposits into the account were approximately $20,000. Approximately $15,000 came from an individual named Joseph Schluessel, purportedly from two diamond transactions. By the end of August 1996, Respondent had spent all the funds in the Am–C.A.R. account.

34. In the latter part of 1996, Mr. Weinstein advised Respondent that he was no longer interested in investing in the Am–C.A.R. venture and requested the return of his $48,000 which had been deposited in the NationsBank Trust Account. On December 1, 1996, Respondent wrote to Mr. Weinstein that his "request would be honored." Respondent did not tell Mr. Weinstein that he had spent the funds that he had agreed to hold in trust; instead, Respondent offered to pay interest on Mr. Weinstein's money "while we have held it" and promised to return the funds by the end of 1996. Respondent added that he preferred to do so "out of profits and not out of capital." *Id.*

35. Mr. Weinstein responded by letter dated December 2, 1996 in which he sought information on Am–C.A.R. Mr. Weinstein wrote a further letter dated December 12, 1996, repeating his request for a refund of his money as well as Mr. Zimmerman's which had been "entrusted to [Respondent's] care pending the formation of the Am–C.A.R. partnership."

36. On January 6, 1997, Respondent again wrote that he would refund Mr. Weinstein's money with interest at 12%. Respondent further wrote that before he did so, he would distribute the requested "financials together with a year end report" for Am–C.A.R. Respondent added that "this will delay you slightly but will save me from potential criticism for favoring you two [Weinstein and Zimmerman] over the other shareholders."

37. On February 19, 1997, Mr. Weinstein again wrote asking for the return of the $56,000 that he and Mr. Zimmerman had provided to Respondent for investment in the gold partnership. In response, Respondent sent Mr. Weinstein a form to sign, have notarized and return. Mr. Weinstein complied, returning the signed and notarized statement demanding the return of his investment funds.

38. On February 28, 1997, Paul Weinstein wrote again to Respondent to demand the return of his investment money with interest. Mr. Weinstein repeated the agreement he had with Respondent that his investment was only to have been through a limited partnership.

In handwritten notations next to various portions of Mr. Weinstein's letter, Respondent confirmed the demand that there be a limited partnership and said he had not forgotten their original agreement. With regard to returning Mr. Weinstein's money, Respondent stated "Probably by the end of next week; for *sure* by the end of the following week. (I want to do it out of profits of the Mohammad/Washburn 500p kg transaction)." (emphasis in original).

39. Despite all of his promises to refund Mr. Weinstein's investment of $48,000 plus interest, Respondent did not do so. Respondent also did not refund Mr. Zimmerman's $8,000 investment.

40. When Mr. Weinstein did not receive his money as Respondent promised, he filed an ethical complaint with the Office of Bar Counsel against Respondent that was received on April 1, 1997.

D. *Bar Docket No. 436–96: Count Three*

(Failure to Respond)

41. On April 10, 1997, Bar Counsel sent Mr. Weinstein's complaint, with attachments, to Respondent with a cover letter

requesting a response to Mr. Weinstein's allegations by April 21, 1997.

42. Respondent received this letter by April 14, 1997, as he wrote an antagonistic comment to Mr. Weinstein about the lodged ethical complaint. Respondent did not, however, file a response on April 21, 1997 with Bar Counsel or seek an extension of time within which to respond.

43. On May 19, 1997, Bar Counsel sent Respondent a further letter requesting that he respond to the ethical complaint within five days. Respondent did not file a response by May 27, 1997, nor did he seek a further extension of time in which to respond.

44. By letter dated June 4, 1997, Respondent acknowledged receipt of the ethical complaint and Bar Counsel's letter of May 19, 1997, and requested additional time in which to submit his response. On June 6, 1997, Bar Counsel granted Respondent a further extension, until July 9, 1997, to submit his response. Respondent promised to file a response by that date. But then, by letter dated July 8, 1997, he requested a further extension, until July 14, 1997, to file a response. No response, however, was filed on July 14, 1997.

45. On July 16, 1997, Respondent stated that he would file a response to Mr. Weinstein's ethical complaint by July 18, 1997. He again failed to file a response by his proposed deadline.

46. On July 24, 1997, Bar Counsel filed a motion with the Board to compel a written response to Bar Counsel's inquiry, pursuant to D.C.App. R. XI, §§ 2(b)(3) and 8(a) of the Rules of the Court of Appeals Governing the Bar and Board Rule 2.10. A copy of the motion was mailed on July 24, 1997 to Respondent at the address that he provided in June 1997 and was not returned.

47. On August 6, 1997, the Board ordered Respondent to respond to each allegation of the complaint within ten days of the date of its order. The Board further ordered that, if Respondent should fail or refuse to respond within the ten-day period, Bar Counsel should consider whether Respondent's conduct constituted, *inter alia,* conduct that seriously interferes with the administration of justice in violation of Rule 8.4(d). The Board's order was mailed to Respondent at the address provided to Bar Counsel in June 1997.

48. By letter dated August 29, 1997, Respondent acknowledged that he still had not filed a substantive response to Mr. Weinstein's ethical complaint, contending, among other things, he had been ill.

49. By the end of September 1997, Respondent still had not responded to Mr. Weinstein's ethical complaint. Accordingly, Bar Counsel submitted a specification of charges and petition instituting disciplinary proceedings against Respondent. On October 8, 1997, a Contact Member approved Bar Counsel's specification of charges.

50. On October 10, 1997, the date on which the petition and specification of charges were served on Respondent, he delivered a substantive response to Mr. Weinstein's ethical complaint.

E. *Bar Docket No. 436–96: Count Five*

(Failure to Respond)

51. On February 3, 1998, Bar Counsel received a notice from NationsBank that Respondent's trust account was overdrawn. On February 13, 1998, Bar Counsel sent the overdraft notice to Respondent with a cover letter requesting a response no later than February 23, 1998.

52. On February 10, 1998, Bar Counsel received another notice from NationsBank that Respondent's trust account was over-

 

drawn. On February 20, 1998, Bar Counsel sent this next overdraft notice to Respondent with a cover letter requesting a response no later than March 2, 1998.

53. On March 2, 1998, Bar Counsel received yet another notice from Nations-Bank that Respondent's trust account again was overdrawn. On March 2, 1998, Bar Counsel sent the overdraft notice to Respondent, with a cover letter referencing the February 13 and February 20 overdraft letters and requesting a response to this latest overdraft notice no later than March 12, 1998.

54. By March 10, 1998, Respondent had not filed a response to any of Bar Counsel's letters, nor had he sought an extension of time in which to respond. On March 10, 1998, Bar Counsel sent Respondent a further letter requesting that he respond within five days to letters relating to the overdrafts. Respondent did not file a response by March 15, 1998, nor did he seek an extension of time in which to respond.

55. On April 1, 1998, Bar Counsel's process server personally served on Respondent the three overdraft notices and Bar Counsel's letters of February 13 and 20 and March 2 and 10, 1998, together with a subpoena for records relating to the NationsBank Trust Account. Respondent failed to respond to Bar Counsel's letters or honor the subpoena.

56. Based on representations in Respondent's answer that the NationsBank Trust Account was "one of [his] Trust Accounts" and that he had other IOLTA and "real" attorney trust accounts, Bar Counsel sent a letter and subpoena to Respondent dated October 26, 1998, directing him to produce his records for each trust and/or IOLTA account that he had maintained during the period from June 1995 through February 1998. Bar Counsel previously had requested such records by letters and subpoenas dated April 29 and July 22, 1997 and March 31, 1998.

57. On October 30, 1998, a process server personally served Bar Counsel's October 26, 1998 letter and subpoena upon Respondent. On November 16, 1998, the return date "on" the subpoena, Respondent requested an additional week in which to respond to the subpoena. The extension was granted, but Respondent failed to respond.

58. On December 2, 1998, Bar Counsel filed a motion with the District of Columbia Court of Appeals (the "Court") to enforce the subpoena *duces tecum*. Respondent did not oppose or otherwise respond to the motion.

59. By order dated December 21, 1998, the Court granted Bar Counsel's motion and directed Respondent to produce all documents and files described in Bar Counsel's subpoena within 10 days from the date of the order. On that date, Bar Counsel sent copies of the Court's order to Respondent by facsimile and mail. The fax history report reflects that Respondent's office received a copy of the Court's order, together with Bar Counsel's cover letter, at 4:28 p.m. on December 21, 1998.

60. Respondent did not produce any document or file in response to the Court's order. Instead, he sent a letter dated January 7, 1999, acknowledging that he was "(unintentionally) in contempt of the Court's Order on the documents." He then made various explanations for his failure to comply with the Court's order and indicated that he would comply.

61. By letter dated January 11, 1999, Respondent acknowledged that he still had not produced any documents responsive to the subpoena, as directed by the Court. However, he promised to do so by the next day. He did not deliver any documents on

the following day or at any time thereafter.

62. Bar Counsel again reminded Respondent, by letter dated March 30, 1999, that he had failed to comply with the Court's order. Respondent failed to produce any documents in response to the subpoena, notwithstanding the Court's order of December 21, 1998.

63. On April 7, 1999, Bar Counsel filed a motion with the Court for an order to show cause why Respondent should not be held in civil contempt of the Court for failing to comply with its order. On May 3, 1999, Respondent served his opposition to the show cause motion on Bar Counsel with an attached affidavit. He did not, however, file the opposition with the Court.

64. By orders dated May 10 and 12, 1999, the Court directed Respondent to show cause why he should not be held in civil contempt.

### III. *ANALYSIS AND DISCUSSION*

#### A. *Bar Docket No. 436–96: Count One*

(Commingling/Dishonesty/Failure to Maintain Complete Records)

1. *Commingling.* Respondent violated Rule 1.15(a) prohibiting commingling as he failed to "hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property." *Id.* The evidence clearly established that Respondent commingled funds entrusted to him as a lawyer by clients and third parties with his own earned fees and other personal assets in his NationsBank Trust Account. Respondent's defense that he used this trust account as a "triage account" into which all incoming funds were deposited for a short period of time before being redeposited into a more appropriate account not only fails as a defense to com-

mingling (even if there was truth to this statement), but also fails because this claim is plainly contradicted by the facts. The rule against commingling has three principal objectives: to preserve the identity of client funds, to eliminate the risk that client funds might be taken by the attorney's creditors, and most importantly, to prevent lawyers from misusing/misappropriating client funds, whether intentionally or inadvertently. *See In re Goldberg,* 721 A.2d 627, 628 (D.C.1998) (per curiam); *In re Ross,* 658 A.2d 209, 211 (D.C.1995); *In re Choroszej,* 624 A.2d 434, 438 (D.C. 1992) (per curiam) (Wagner, J. concurring); *In re Hessler,* 549 A.2d 700, 702 (D.C.1988). Respondent's misuse of his NationsBank Trust Account plainly violated all three objectives.

2. *Dishonesty.* Bar Counsel charged Respondent with a violation of Rule 8.4(c)(dishonesty) for using his trust account for personal purposes at a time when he had various unpaid judgments and with writing more than 40 checks between June 1995 and February 1998 when the funds in Respondent's trust account were insufficient to cover the checks. The Hearing Committee did not address whether Respondent violated the charged ethical rule with respect to using his escrow account to conceal the ownership of his funds from creditors. The Board, however, has reviewed the evidence presented to the Hearing Committee on this alleged violation and we find that Bar Counsel has failed to establish this violation by clear and convincing evidence.

With regard to depositing personal funds in his trust account, all that Bar Counsel has established is that Respondent used his trust account for personal and business reasons and that when he did so, he had judgments and IRS liens outstanding. There was no evidence presented that he was so misusing his trust ac-

count to dishonestly hide his money from creditors or, for that matter, anyone else. If anything, the evidence was to the contrary. Among the alleged improper uses of his trust account was that Respondent used it for personal reasons, including payment of a portion of a lien that the IRS had placed on him. It is difficult to conclude that Respondent was using his trust account to hide funds from the IRS when he was using that same account to pay the IRS's lien. If anything, the danger here was that the IRS might seize all the funds in this trust account, including client funds, in an attempt to satisfy its tax lien. It is this kind of danger that the rule against commingling is designed to prevent.

Bar Counsel appears to be arguing that a lawyer automatically engages in dishonesty in violation of Rule 8.4(c) if the lawyer deposits personal funds, regardless of amount, in a trust account and then writes a check against those funds while holding outstanding debts or obligations. We disagree; we believe that there must be some showing of a dishonest intent—such as an intent to hide the lawyer's personal assets. Dishonesty violations are fact driven, and Bar Counsel must prove facts sufficient to establish the dishonest intent. Bar Counsel failed to develop such facts here.

The Hearing Committee did, however, find that Respondent engaged in dishonesty by writing more than 40 checks on his trust account against insufficient funds between June 1995 and February 1998. The Hearing Committee particularly noted that Respondent continued to write these checks on his trust account even after having been notified numerous times by the Bank that his account was overdrawn. The Hearing Committee concluded, and we agree, that Respondent's conduct rose to the level of dishonesty (but not necessarily to the level of fraud, deceit or misrepresentation). Under Rule 8.4(c), the term

"dishonesty" includes "conduct evincing 'a lack of honesty, of fairness and straightforwardness'." *In re Shorter*, 570 A.2d 760, 767–68 (D.C.1990). Respondent's repeated writing of checks without sufficient funds, particularly after the bank had sent repeated notices of his lack of funds, plainly demonstrates dishonesty.

### B. Bar Docket No. 436–96: Count Two

(Misappropriation/Failure to Promptly Disburse Funds/Failure to Render An Accounting/Conflicts of Interest/Engaging in Criminal Conduct/Dishonesty)

1. *Misappropriation.* The Court has recently reaffirmed its long standing definition of misappropriation in *In re Carlson & Cafferty*, 802 A.2d 341 (D.C.2002) as:

any unauthorized use of client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [she] derives any personal gain or benefit therefrom.

*Id.* at 359 (quoting *In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983)). *See also In re Anderson*, 778 A.2d 330, 335 (D.C.2001) (quoting the same language in *Harrison*). The Board agrees with the Hearing Committee's conclusion that the evidence clearly demonstrated that Respondent intentionally misappropriated entrusted funds provided to him by Mr. Weinstein. Hearing Committee Report at 25. The evidence also supports the Hearing Committee's conclusions that Respondent's misappropriations were at least reckless in that he wrote checks on his NationsBank Trust Account regardless of whether he was using client funds or no funds. Writing trust account checks on insufficient funds was a common practice by Respondent. *Id.* at 25–26.

Respondent received Mr. Weinstein's funds while serving as Mr. Weinstein's

attorney. Mr. Weinstein testified that he believed he was a client of Respondent's law firm. While the client's belief is not dispositive, Respondent conceded that other lawyers in his firm were performing legal services on behalf of a legal entity (Proforma Partners) of which Mr. Weinstein was the client representative during the time Mr. Weinstein provided these funds.

Moreover, Respondent was doing legal work for Mr. Weinstein when he agreed to draft the necessary documents to create a limited partnership for Mr. Weinstein and Mr. Zimmerman. Respondent expressly agreed to hold Mr. Weinstein's funds in his NationsBank Trust Account while the pieces for the proposed Am–C.A.R. business were being assembled and the limited partnership established. Respondent represented that one of the lawyers in his firm would be Am–C.A.R.'s general counsel.

The Hearing Committee did not credit Respondent's testimony that Mr. Weinstein was simply investing in a corporation of which Respondent was an officer and that Mr. Weinstein's funds did not have to be held in trust. The Hearing Committee found this contention was directly contradicted by the documentary evidence created when Mr. Weinstein provided these funds. This evidence fully supported Mr. Weinstein's testimony.

As the evidence further showed, Respondent almost immediately used all of Mr. Weinstein's money for purposes other than the desired limited partnership. By May 1, 1996, slightly more than one month after Mr. Weinstein deposited his $48,000 in Respondent's trust account, its balance stood at $665.65. The evidence showed Respondent using the funds in his trust account, including Mr. Weinstein's, to pay various personal and business expenses. As detailed in the Findings of Fact, Respondent paid many of his personal expenses with entrusted funds. None of these expenditures of Mr. Weinstein's funds were with his knowledge or with his consent. We agree with the Hearing Committee that Respondent engaged in misappropriation that was at least reckless, and more likely intentional, in violation of Rule 1.15(a).

2. *Failure To Deliver Funds and to Render an Accounting.* Rule 1.15(b) requires that:

> a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property . . . .

This is another of the charged violations which the Hearing Committee did not address. We do so here based on the Hearing Committee record. Respondent failed to promptly deliver Mr. Weinstein's funds in December 1996 or to provide Mr. Weinstein with a full accounting as required by Rule 1.15(b). As discussed above, Respondent did not pay Mr. Weinstein promptly because he had already spent all of Mr. Weinstein's money and had nothing to return. Respondent instead sent lulling letters to Mr. Weinstein agreeing to repay his investment in full, including 12% interest, but contingent on some concocted event occurring in the future. Mr. Weinstein complied with all of Respondent's requests purportedly necessary to receive his funds, but his repayment still has not been made by Respondent—as Respondent promised.

Respondent does not dispute that he refused to give Mr. Weinstein an accounting regarding the $48,000 which Mr. Weinstein provided to Respondent in trust. Respondent, in his defense, simply claims he had no obligation to provide such an

 

accounting. Rule 1.15(b) plainly contradicts Respondent's contention. We conclude that Respondent's inactions violated Rule 1.15(b).

### C. *Bar Docket No. 436–96: Counts Three and Five*

(Failure to Respond to Bar Counsel)

1. *Conduct Which Seriously Interferes with the Administration of Justice.* The record clearly establishes that Respondent failed to respond to Bar Counsel's reasonable inquiries with regard to the Weinstein complaint (Count Three) and with regard to Bar Counsel's inquiries into overdrafts on his NationsBank Trust Account. Bar Counsel afforded Respondent, in both instances, with multiple opportunities to respond. Respondent also ignored the Order to the Board directing him to respond to the Weinstein complaint. By failing to respond to those inquires by Bar Counsel and to comply with the Board's Order to Respond, Respondent violated Rule 8.4(d) of the Rules of Professional Conduct and D.C.App. R. XI, § 2(b)(3).

### IV. CONCLUSION

In light of our finding that Respondent engaged in an intentional and reckless misappropriation, the appropriate sanction here is disbarment. *In re Carlson & Cafferty,* 802 A.2d at 341; *In re Addams,* 579 A.2d 190 (D.C.1990) (en banc). Respondent should also be ordered to make restitution to Mr. Weinstein with interest.

We also add that this is one of those rare cases where Respondent's misconduct in addition to his misappropriation was so regular and so callous to his ethical obligations that disbarment might well be warranted on those facts alone. He routinely and blatantly chose to ignore the rules of this Court and the laws in general. He repeatedly refused to recognize the seriousness of his violations. He believes he can use funds that come into his possession however he chooses and he feels he has no obligation to respond to Bar Counsel when he is alleged to have committed serious violations. He accuses anyone who dares to question his unethical conduct, including Bar Counsel and his former clients, of extortion and lies. His disbarment is warranted for these reasons in addition to his acts of misappropriation.