884 So.2d 561 (2004)
In re John V. LAWRENCE.
No. 2004-B-0019.
Supreme Court of Louisiana.
October 19, 2004.
*562 Charles B. Plattsmier, Chief Disciplinary Counsel, Shana M. Broussard, Deputy Disciplinary Counsel for Applicant.
John V. Lawrence, Mandeville, for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS.
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, John V. Lawrence, an attorney licensed to practice law in Louisiana.

UNDERLYING FACTS AND PROCEDURAL HISTORY
On May 1, 1997, respondent was employed as an associate by the Gretna law firm of Windhorst, Gaudry, Ranson, Higgins & Gremillion, L.L.C. (the "Windhorst firm"). In June 1997, Allison Curtis retained the Windhorst firm to represent her in a personal injury matter. The firm accepted the representation on a one-third contingent fee basis, and respondent was thereafter assigned to handle certain tasks in connection with the file. On April 24, *563 1998, respondent filed a petition for damages on behalf of Ms. Curtis in the matter entitled Allison Curtis v. Beaver Productions, Inc., et al., No. 98-7317 on the docket of the Civil District Court for the Parish of Orleans. On July 6, 1998, the Metairie law firm of Aubert & Pajares, L.L.C. (the "Aubert firm") filed an answer to the petition on behalf of the defendants. On July 14, 1998, respondent resigned from the Windhorst firm to accept a position as an associate with the Aubert firm, working in its Covington office.
Following respondent's departure from the Windhorst firm, a partner of the firm, Daryl Higgins, assumed responsibility for the handling of Ms. Curtis' personal injury case. On August 11, 1998, Mr. Higgins filed a motion to disqualify the Aubert firm from the continued representation of the defendants in the Curtis matter. In support, Mr. Higgins alleged that the time records maintained by the Windhorst firm reflected that respondent had worked on the Curtis case for approximately fifteen hours, performing such tasks as interviewing the client, writing correspondence to the client, medical providers, and others, reviewing correspondence, drafting pleadings, and making telephone calls. Consequently, Mr. Higgins argued that respondent had knowledge of relevant, confidential information that must be imputed to the other members of the Aubert firm under the Rules of Professional Conduct.
In opposition to the motion, the Aubert firm submitted an August 13, 1998 affidavit prepared by respondent attesting that he did not possess any privileged information about the Curtis case that would require the disqualification of his new firm from the matter. Furthermore, respondent stated that regardless of what his timesheets reflected, he only worked on the Curtis case for one hour during the period of his employment with the Windhorst firm. According to respondent, while he was associated with the Windhorst firm he "padded" his timesheets with hours he did not actually work. Respondent explained that he did so because he "frequently had too little work to do to occupy all my time," and that when he brought his concern to the partners, he was "encouraged, both specifically and by implication, to `pad my bills.'" Believing "it is wrong to bill clients for work that is not done," but fearing he would lose his job if he did not do so, respondent decided
to "pad" my bills in the plaintiff's personal injury contingency fee cases on which I was working by logging time that I did not actually work. I felt this was the most acceptable solution to my dilemma, because (a) bills in plaintiff's personal injury contingency fee cases are not paid by the client, so there was no real damage done to anyone by a "padded bill," and (b) when my total hours were checked by the partners of the firm, the amount would be high enough to keep my job. While this was not a perfect solution to a tough dilemma, it was the best, in my view, under the circumstances.
Therefore, to the extent that his timesheets from the Windhorst firm reflected more than one hour of work on the Curtis case, respondent explained in his affidavit that it was "simply work that was logged but not done ... to satisfy the billing requirements of the firm to save my job." Respondent's affidavit was placed under seal pursuant to an order of the trial court signed on September 16, 1998.[1]
*564 The motion to disqualify was set for hearing before Judge Max N. Tobias, Jr. on September 18, 1998. On the day of the hearing, the Aubert firm withdrew its opposition to the motion; accordingly, Judge Tobias granted the motion and disqualified the Aubert firm. The same day, Judge Tobias mailed the ODC a copy of respondent's affidavit (as well as a countervailing affidavit offered by a partner of the Windhorst firm) "for such actions as you may wish to take in the matter."
On September 22, 1998, the Windhorst firm filed a complaint against respondent with the ODC. The Windhorst firm also sought the imposition of sanctions against respondent and the Aubert firm and filed a rule for contempt against them in the trial court. On February 17, 1999, respondent gave a deposition under oath in connection with the civil matter. Although respondent invoked the Fifth Amendment in response to any questions concerning the affidavit or its contents, in response to a question whether he "put work down on the Allison Curtis file that was not truly reflective of the time that [he] spent doing the work," respondent answered "yes."
In September 1999, Ms. Curtis settled her personal injury claim against the defendants. The parties filed a motion to dismiss in connection with the settlement, which purported to reserve Ms. Curtis' right to pursue the contempt and Rule 863 motions against respondent and the Aubert lawyers. Nevertheless, on February 11, 2000, Judge Tobias dismissed those matters, concluding they are properly addressed in the context of a lawyer disciplinary proceeding.

DISCIPLINARY PROCEEDINGS
On July 12, 2002, the ODC filed formal charges alleging that respondent's conduct (specifically the "padding" of his timesheets in the Curtis case) violated Rules 8.4(a) (violation of the Rules of Professional Conduct) and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. Respondent answered the formal charges and denied any misconduct. The matter then proceeded to a formal hearing on the merits.

Hearing Committee Recommendation
After reviewing the evidence presented at the hearing, the hearing committee made a factual finding that a question exists concerning the actual amount of time respondent spent working on the Curtis file while employed by the Windhorst firm. Nevertheless, the committee found that prior to an offer of employment being extended by the Aubert & Pajares firm, respondent disclosed that he had worked on the Curtis matter, which was then being defended by his prospective employer. The firm inquired whether respondent had performed substantial tasks on the Curtis matter, and he assured them that he had not.
Based on these factual findings, the committee determined that respondent violated Rules 8.4(a) and 8.4(c) of the Rules of Professional Conduct. Respondent submitted false billing statements to his former firm, knowing the information was dishonest, and induced the firm to consider his bills as a determining factor regarding compensation. Respondent's actions also caused his former firm financial hardship and resulted in a delay in having the Curtis matter timely resolved. The committee specifically rejected respondent's assertion of a "no harm, no foul" defense, noting such thinking "belies the true meaning of Rule 8.4(c) which prohibit[s] giving false or dishonest statements." The committee found the baseline sanction for respondent's misconduct is a suspension from the practice of law.
*565 The committee considered in aggravation respondent's refusal to acknowledge the wrongful nature of his conduct and observed that respondent's lack of truthfulness cannot be condoned, for doing so "would serve to further damage the public perception of lawyers." The committee made no finding that mitigating factors are present, but nonetheless deviated downward from the baseline sanction to recommend that respondent be publicly reprimanded.
The ODC filed an objection to the leniency of the sanction recommended by the hearing committee. Respondent objected to the entirety of the hearing committee's report and recommendation.

ORDER OF THE DISCIPLINARY BOARD
On November 18, 2003, the disciplinary board ordered that respondent receive a public reprimand and that he be required to attend Ethics School.
Based on its review of the record, the board found the following facts were proven by clear and convincing evidence:
1. Respondent was admitted to practice law on October 5, 1990;
2. Respondent was hired to work at the Windhorst firm on May 1, 1997;
3. On June 17, 1997, respondent and Daryl Higgins of the Windhorst firm met with a potential client, Allison Curtis;
4. At the conclusion of this meeting, Ms. Curtis entered into a contingent fee contract with the Windhorst firm;
5. Following the meeting respondent was assigned to complete various tasks in connection with the Curtis matter. These tasks included, but were not limited to, arranging for medical treatment for Ms. Curtis, obtaining releases from Ms. Curtis, and preparing a petition for damages;
6. On April 24, 1998, respondent prepared and filed in Orleans Parish a petition for damages in connection with the Curtis matter;
7. On July 14, 1998, respondent accepted employment with the law firm of Aubert & Pajares, which represented the defendants in the Curtis matter;
8. Prior to extending an offer of employment to respondent, Christopher Aubert asked respondent about his prior involvement in the Curtis matter;
9. Respondent advised Mr. Aubert that he had only worked on the Curtis matter for one hour;
10. Subsequently, Mr. Higgins filed a motion to disqualify Aubert & Pajares from continuing their representation of the defendants in the Curtis matter;
11. In the motion, Mr. Higgins stated that respondent had worked fifteen hours on the Curtis matter while Semployed at the Windhorst firm;
12. In response, respondent prepared and submitted an affidavit "to explain to the [c]ourt the fifteen hours that [he] was claimed to have worked on the Curtis file by Mr. Higgins";
13. Respondent stated that in response to a conversation he had had with one of the partners in the Windhorst firm "point[ing] out the necessity of producing more billable hours," respondent "found the answer in the contingency fee files that [he] had ..." Specifically, respondent "put time down to contingency fee files knowing that it made no difference to the client, or his recovery, how many hours [he] *566 worked on that file. In this manner, [respondent] could keep [his] job and no client would receive a bill for unnecessary or non-existent work"; and
14. While at the Windhorst firm, in connection with the Curtis matter, respondent listed hours on his timesheets for work not actually performed.
Based upon these facts, the board determined that respondent violated Rules 8.4(a) and 8.4(c) of the Rules of Professional Conduct. Respondent intentionally indicated on his timesheets that he performed work in a client's legal matter that he now states he did not actually perform.
Turning to the issue of an appropriate sanction, the board found respondent intentionally violated duties owed to his client, to the public, and as a professional. Respondent's actions did not result in actual injury to Ms. Curtis, but did result in actual injury to the legal profession. By his actions, respondent has violated the ethical standards of the legal profession and has tarnished the image of the profession. Respondent also owes the public a duty to maintain standards of personal integrity. By misrepresenting the number of hours on his timesheets, respondent has failed to maintain such standards. The baseline sanction for respondent's misconduct ranges from a public reprimand to a suspension.[2]
The board found the only mitigating factor present is the absence of a prior disciplinary record. In aggravation, the board recognized respondent's dishonest or selfish motive, a pattern of misconduct,[3] and refusal to acknowledge the wrongful nature of his conduct.
Under these circumstances, the board concluded that a public reprimand is appropriate. Accordingly, the board ordered that a public reprimand be issued against respondent, with the condition that within one year, respondent attend and successfully complete the Louisiana State Bar Association's Ethics School.
One board member dissented and would recommend that respondent be suspended from the practice of law for three months.
Both parties sought review of the board's ruling by this court. We ordered the parties to submit briefs addressing the issue of whether the record supports the disciplinary board's report. After reviewing the briefs filed by both parties, we docketed the matter for oral argument.

DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992).
The record of this matter demonstrates that over a period of eleven months, respondent deliberately submitted *567 false documents to the Windhorst law firm misrepresenting the number of hours he worked on his client's personal injury matter. The fact that respondent's timesheets were not used for the purpose of client billing does not impact our determination that a sanctionable ethical violation occurred.[4] Rather, we focus on respondent's admission that the entries on the timesheets were inflated and that they reflected more time than he had actually spent working on the Curtis file. There is no doubt that such conduct is dishonest, fraudulent, and deceitful, in violation of Rules 8.4(a) and 8.4(c) of the Rules of Professional Conduct. As the highest court of the District of Columbia observed in In re Schneider, 553 A.2d 206, 209 (D.C.1989):
Documents are an attorney's stock in trade, and should be tendered and accepted at face value in the course of professional activity. If an attorney knowingly proffers altered documents in a context where the attorney knows or should know that action may be taken thereon, the attorney has engaged in conduct involving deceit in violation of [Rule 8.4(c)], whatever the ultimate intent or motives may have been in making such alterations. The latter may go to sanction, but not to the threshold issue of violation vel non. [internal footnote omitted]
Having found professional misconduct, we now turn to a discussion of an appropriate sanction. In considering that issue, we are mindful that the purpose of disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain the appropriate standards of professional conduct, to preserve the integrity of the legal profession, and to deter other lawyers from engaging in violations of the standards of the profession. In re: Vaughan, 00-1892 (La.10/27/00), 772 So.2d 87; In re: Lain, 00-0148 (La.5/26/00), 760 So.2d 1152; Louisiana State Bar Ass'n v. Levy, 400 So.2d 1355 (La.1981). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. In re: Redd, 95-1472 (La.9/15/95), 660 So.2d 839; Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
We find that respondent knowingly violated duties owed to the public and to the legal system. Respondent's actions in padding his timesheets caused harm to the Windhorst firm by compromising the integrity of its billing system, and caused harm to Ms. Curtis, whose personal injury matter was delayed unnecessarily while the lawyers involved in the case battled over the motion to disqualify and the ancillary rule for contempt and motion for sanctions. Under such facts, we conclude that the applicable baseline sanction is a suspension from the practice of law.
In mitigation, we acknowledge that respondent has no prior disciplinary record. However, this solitary factor is insufficient to justify any downward deviation from the baseline, given the aggravating factors present, which include respondent's dishonest or selfish motive, pattern of misconduct, and substantial experience in the practice of law (admitted 1990). Perhaps most persuasive, however, is respondent's persistent refusal to acknowledge the wrongful nature of his conduct. Respondent has not demonstrated a scintilla of remorse in these proceedings, and to this day feels that his actions were correct, and indeed, completely appropriate. Under *568 the circumstances, and taking into account all of the interests to be served by the lawyer disciplinary process, we will suspend respondent from the practice of law for a period of three months.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that John V. Lawrence, Louisiana Bar Roll number 20265, be suspended from the practice of law for a period of three months. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
NOTES
[1] The affidavit was sealed at the request of the Aubert firm to protect the reputation of the Windhorst firm.
[2] Standard 5.13 provides for a reprimand when a lawyer knowingly engages in conduct involving dishonesty, fraud, deceit or misrepresentation and that adversely reflects on the lawyer's fitness to practice law. By contrast, Standard 7.2 provides that suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.
[3] Respondent made numerous admittedly false entries on his timesheets between June 17, 1997 and May 11, 1998.
[4] Of course, had the false timesheets resulted in the client being billed for more work than was actually performed, the sanction we would impose would be harsher.