In re Michael A. ROMANSKY, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals.

No. 05–BG–658.

District of Columbia Court of Appeals.

Argued May 18, 2006.
Decided Dec. 20, 2007.

---

John T. Rooney, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, was on the brief, for the Office of Bar Counsel.

Earl J. Silbert, with whom Robert A. Salerno, Washington, DC, was on the brief, for respondent.

Lisa Lerman filed a brief on behalf of the District of Columbia Bar as amicus curiae.

Before GLICKMAN and KRAMER, Associate Judges, and BELSON, Senior Judge.

KRAMER, Associate Judge:

This case returns to the Court of Appeals from the Board on Professional Responsibility ("Board") after a remand in *In re Romansky*, 825 A.2d 311 (D.C.2003) ("*Romansky I* "). In its first Report and Recommendation, the Board found that the respondent had committed three distinct violations of DISTRICT OF COLUMBIA RULES OF PROF'L CONDUCT R. 8.4(c), which provides, "It is professional misconduct for a lawyer to ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation...." In *Romansky I*, we affirmed in part, reversed in part, and remanded to the Board for reconsideration of whether two of the claims at issue constituted dishonest conduct under Rule 8.4(c), anticipating that the Board would make further factual findings with respect to the respondent's "actual state of mind in the existing circumstances" that would specify whether the respondent "acted knowingly or recklessly when he adjusted the client bills." 825 A.2d at 311, 317. Moreover, in remanding, we directed the Board to "determine whether Romansky's explanation for his conduct is true." *Id.*

Further, we instructed, "When conducting its analysis, the Board must clearly articulate its findings and make credibility determinations to support its conclusions." *Id.* Despite these instructions, both the Office of Bar Counsel ("Bar Counsel") and the respondent advised the Board that further fact-finding was unnecessary, and the Board accepted their position. Thus, on the record previously developed, the Board applied the legal standard set forth in *Romansky I* and found that there was insufficient evidence of the respondent's dishonesty on the two counts still at issue.

Despite its choice to forego further fact-finding, Bar Counsel has filed an exception to the Board's Report.[1] It is not ordinarily our role to act as the fact-finder, but rather to give deference to the Board's findings so long as they are supported by substantial evidence. D.C. Bar R. XI, § 9(g). In this instance, however, we conclude that the primary issue is whether or not the respondent was reckless, as opposed to negligent. That issue, involving ultimate facts, we may review *de novo*. *In re De Maio*, 893 A.2d 583, 585 (D.C.2006). Having examined the question, we conclude that the record is sufficient to find by clear and convincing evidence only that he was negligent, not reckless. We also review the sanction of thirty-day suspension recommended by the Board. The majority of this panel concludes that there is not adequate reason to depart from the Board's recommendation, and thus the court imposes a suspension from the practice of law for a period of thirty days. Judge Kramer writes separately regarding the sanctions to set forth the reasons why she would impose a sanction of sixty days.

---

[1] While the respondent has not filed an exception to the Board's Report, he has filed a reply to Bar Counsel's exception.

## I. Facts

### A. Background

As we noted in *Romansky I,* the basic facts of this case are largely undisputed. At all relevant times, the respondent was a partner and leader of the health care practice at the Washington, D.C. office of McDermott, Will & Emery ("McDermott"). In that capacity, he had significant billing responsibilities. In late 1994, McDermott instituted a change in its billing practices. Under the firm's old engagement letters, it billed clients based solely on hourly rates. The firm's new engagement letters allowed, inter alia, attorneys to charge a premium for services rendered and informed clients that "fees will be based *primarily* on the time spent by each professional, although other factors may be taken into consideration" (emphasis added). McDermott instructed billing attorneys to use the new billing practices effective September 12, 1994.

The events at issue on this appeal took place during the transition from the old billing arrangement to the new one and regard bills prepared for two firm clients, Dr. Steven Siepser and Surgical Health Corporation ("SHC"). Though the respondent prepared the bills for these clients after the effective date of the new billing practices, he concedes that the old engagement letter limiting billing to hours actually worked by the firm's attorneys still governed their billing arrangements because new engagement letters had not been sent to these clients, and they had never consented to a new fee structure.

McDermott's standard practice during the relevant time period was for its administrative personnel to first send "pre-bills" to billing attorneys for their review. The pre-bills were internal firm records and were not sent out to clients in the ordinary course of business. After the billing partner's review, the pre-bills went back to billing specialists for processing. The billing attorneys then received drafts of the final bills and another opportunity to make corrections before the final statements went to the clients.

### B. The Siepser and SHC Matters

In 1994, Dr. Siepser had engaged the firm to help him obtain approval for an ambulatory surgical center in Pennsylvania. The respondent asked another firm attorney, Robert Shay, to work on the case. In short order, Mr. Shay completed the assignment and, in addition, obtained a refund of more than $21,000 in fees from a law firm that the client had previously retained. After reviewing the September 1994 pre-bill for Dr. Siepser, the respondent decided that a $700 premium would be appropriate in light of the quality of the representation provided by Mr. Shay. Rather than expressly adding the premium to the bill, however, the respondent, without consulting Mr. Shay, added three hours to the time that he had recorded for the matter. On November 17, 1994, McDermott sent a bill to Dr. Siepser that provided only a bottom-line figure for "professional services rendered" and did not inform him of the changed hours or that a premium had been charged. The respondent testified that he does not remember ever focusing on the terms of Dr. Siepser's engagement letter when working on the bill.

The SHC matter began in mid–1994 when the client contacted the respondent seeking advice concerning various issues. The respondent and another attorney, Diane Millman, worked on the matter. Again the respondent determined that the firm had provided exceptional service to the client in a cost-effective manner and decided to add a $530 premium to the pre-bill. He added two hours to the time recorded by Ms. Millman based upon his

belief that the value of her services exceeded the amount that McDermott would earn based solely on hourly rates. The respondent testified that he did not recall considering which billing policy applied to SHC. The final bill sent to SHC did not disclose the hour adjustments or that the firm had charged a premium.

The respondent openly acknowledges that he intended to charge a premium in both cases and that he accomplished this by adding to the hours recorded by his associates. Before the Hearing Committee, he testified that he did not intend to make the bills misleading or dishonest. The Hearing Committee did not discredit this testimony, and despite the number of questionable billing actions taken by the respondent, there is no direct evidence in the record indicating that the respondent knew that the two cases were governed by the old engagement letter which provided that clients would only be charged for the time McDermott's professional staff actually spent working on the clients' cases. At the time the bills were prepared—shortly after the announced change in billing practices—the firm did not yet have a policy in place addressing how attorneys should add premiums to a client's bill. Moreover, the Hearing Committee and the Board also found that the respondent's attempts to charge a premium in these cases could not have affected his compensation from McDermott.

Charles Work and James Sneed, partners at McDermott at the time, acknowledged that the respondent might have been confused as to which billing policy was applicable to the Siepser and SHC matters at the time he worked on the bills. The respondent sent out thirty to sixty bills each month,[2] and Mr. Sneed testified that "any billing attorney with that volume wouldn't necessarily be able to know immediately which letter was applicable to which client at a particular time."[3] According to Mr. Work, McDermott's internal investigation found "no evidence really to contradict [the respondent's] view that he was just mistaken about how to [charge a premium] correctly" and that the respondent had "never tried to cover that up."[4]

## II. Romansky I

In its first Report, the Board found that the respondent's conduct in the Siepser and SHC matters constituted "dishonesty" under Rule 8.4(c). The Board adopted the Hearing Committee's conclusion that the respondent deliberately increased the hours billed in order to charge a premium that he was not entitled to, and that this alone was sufficient to constitute dishonesty.

In Romansky I, we rejected this conclusion. We noted that the respondent, "while conceding that he premium billed

2. There was conflicting testimony on this point. Thirty to forty bills appears to have been the Hearing Committee's finding while the Board asserts forty to sixty. The exact number has no dispositive impact on our analysis.

3. Mr. Sneed also testified that "there [was] not a single way that premiums [were] taken" at McDermott during the period relevant to this appeal.

4. Messrs. Work and Sneed disagreed about the appropriate way to charge a premium.

Work testified that, under the new policy, after a client received the new engagement letter, a bill did not need to expressly inform the client that the firm was charging a premium. Sneed disagreed and testified that the bill would have to expressly disclose the premium. While Bar Counsel argues that the respondent's failure to disclose that he was charging a premium on the bill sent to his clients constituted a Rule 8.4(c) violation regardless of whether he was entitled to charge that premium, we need not address that issue to resolve this case.

his clients, contends that he did not know that it was wrongful as unauthorized under the actual client billing agreement, [and] thus any violation was merely negligent[.]" 825 A.2d at 317. In light of the respondent's position, we held that the Board had relied too heavily on *In re Schneider*, 553 A.2d 206 (D.C.1989), in which an attorney falsified travel receipts in order to expedite reimbursement for extra travel expenses that he had incurred on behalf of a client. *Romansky I, supra*, 825 A.2d at 317–18. In contrast to *Schneider*, where the attorney knew that the act of falsifying the receipts was dishonest, *Romansky I* concluded that this might be a " 'situation where the attorney is unaware that he has even committed the act which is the basis of the disciplinary action.' " *Id.* at 317 (quoting *Schneider, supra*, 553 A.2d at 210).[5]

Because the Board had reached no conclusions regarding the respondent's state of mind, we remanded the case with respect to the Siepser and SHC matters so that the Board could consider "[i]f Romansky violated the fee agreements knowingly, or if he did so recklessly—*i.e.*, consciously disregarding the risk that the agreements did not permit premium billing—[and thus] was dishonest and did violate Rule 8.4(c)." *Id.* As noted above, neither Bar Counsel

nor the respondent elected to pursue further fact-finding on remand. The Board, based upon the same record that existed at the time of the first appeal, concluded that the respondent had not acted knowingly or recklessly in charging the premiums.[6] Whether that finding is based upon "substantial evidence" is the issue now before us.

In addition to remanding the Siepser and SHC issues for further consideration, *Romansky I* also affirmed the Board's finding that the respondent violated Rule 8.4(c) when he "authored, backdated and used, without the client's approval, a purported letter from the client" in a misguided attempt to furnish evidence in his defense during his firm's internal investigation of his billing conduct (hereinafter referred to as the FASA matter). *Id.* at 312. It also concluded that the respondent acted dishonestly when he assigned an associate to work on a matter for his father and then instructed her to bill the time to another client's account (hereinafter referred to as the OOSS matter).[7] Because the court was remanding the case to the Board "for specific findings consistent with [that] opinion," it concluded that it would be premature to address the issues of sanctions for those violations. *See id.* at 318. Thus, we must resolve the

---

5. Despite the court's conclusion in *Romansky I*, Bar Counsel continues to argue, as it did in that case, that *Schneider* is controlling precedent for the case before the court. This court is barred from so holding, however, by the decision to the contrary in *Romansky I*. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). Moreover, Bar Counsel's reliance on *In re Lawrence*, 884 So.2d 561 (La.2004), which cited *Schneider*, is misplaced. In that case, an associate at a law firm acknowledged that he intentionally padded the hours that he reported to his firm so that he would not be fired. *Id.* at 563. In contrast, the Board found that the changes the respondent made to the pre-bills would not have had any impact on his compensation from McDermott.

6. Bar Counsel argues that the Hearing Committee found that the respondent acted deliberately and that the Board erred in rejecting that finding. As the Board points out in its Report, however, the Hearing Committee applied the *Schneider* standard that *Romansky I* rejected in reaching this conclusion.

7. We rejected the Board's conclusion that the respondent's actions were "strictly an internal accounting matter" because the client actually paid a flat annual fee and was not affected by the extra hours billed. *Romansky I, supra*, 825 A.2d at 318.

issue of the appropriate sanctions for those violations in this second appeal.

## III. Standard of Review

■ Our standard of review for Board disciplinary recommendations is well established. We "shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar Rule XI, § 9(g)(1). Bar counsel must establish a violation of Rule 8.4 by clear and convincing evidence. *E.g., In re Anderson*, 778 A.2d 330, 335 (D.C.2001).

■ At oral argument, however, there appeared to be some confusion with respect to the deference that we must give the Board when it has reached a conclusion about a *legal* issue, as opposed to a factual issue. As we wrote in the case of *In re De Maio, supra,* 893 A.2d at 585, "[T]he Board's final determinations, whether they are characterized as findings of ultimate fact or conclusions of law, are owed no deference; our review is *de novo.*" Analogizing the deference standard applicable to the Board (with respect to Hearing Committees) to the deference standard of the Court of Appeals (with respect to the Board), we explained in the case of *In re Pierson,* 690 A.2d 941, 946–47 (D.C. 1997), that no deference is owed with respect to ultimate facts that are really conclusions of law. *See also In re Berryman,* 764 A.2d 760, 766 (D.C.2000).

Moreover, with respect to the issue of recklessness, which we address below, we have explicitly clarified that this is a legal issue, not a factual issue. In the case of *In re Carlson,* 802 A.2d 341, 347 (D.C. 2002), for example, we wrote, "[T]he question [of] whether Ms. Cafferty recklessly misappropriated client funds is a legal question which we review *de novo.*" Similarly, in the case of *In re Fair,* 780 A.2d 1106, 1110–11 (D.C.2001), we wrote, "The critical question . . . [of] whether the unauthorized payment [ ] constituted the type of 'intentional and/or reckless' misappropriation which would bring the action within *Addams*[8] . . . . is a conclusion of law requiring de novo review, and we have the obligation to make our own determination on the issue." *See also In re Micheel,* 610 A.2d 231, 234 (D.C.1992) (a finding of negligence by a hearing committee is an " 'ultimate fact' " that is not entitled to deference by the Board). Having thus clarified the standard of review that governs, we next consider *de novo* the Board's conclusion that the respondent did not act knowingly or recklessly, but merely negligently, in charging the premiums to Dr. Siepser and SHC.[9]

## IV. The Board's Factual Findings

While we generally accept the Board's findings of fact, our review discloses one finding that is clearly not supported by substantial evidence, and which we therefore reject. In its Report, the Board states, "Respondent testified that he mistakenly believed that [the Siepser matter] was governed by the new billing policy, not

8. *In re Addams,* 579 A.2d 190, 191 (D.C.1990), held that "in virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence."

9. Bar Counsel, supported by *amicus,* urges the court to "reject the notion that an attorney is ever justified in inflating the number of hour[s] actually worked even if done to effect value-based billing." *Romansky I* rejected such a per se rule and this division cannot reverse that decision. *Ryan, supra,* 285 A.2d at 312.

the old, and that he was therefore entitled to charge a premium based on the favorable results." A review of the respondent's testimony reveals that he did not provide such testimony.

The testimony that the Board cited in support of its finding was obtained on direct examination of the respondent, who first confirmed that he was familiar with the materials that McDermott had provided to its attorneys regarding the new billing policy. His counsel then asked, "And in your view, with respect to the bill sent to Dr. Siepser on November 17, 1994, during the course of the test period, did the factors on which you relied comply or comport with that brochure?" The respondent answered, "I thought so."

In fact, nowhere in his testimony did the respondent state that at the time he billed Dr. Siepser he believed that Dr. Siepser's legal matter was governed by the new billing policy. Although the respondent testified that he believed his bill *comported* with that policy, there is no evidence in the record that at the time he worked on Dr. Siepser's bill he had formed an opinion as to which engagement letter controlled that matter. Indeed, when his counsel asked him what focus he had placed on the engagement letter when he prepared the bill, the respondent replied, "I don't recall focusing on it."

Thus, contrary to the Board's finding, the record does not reflect that, at the time he prepared the Siepser bill, the respondent believed that the new billing policy governed the matter. At best it demonstrates that he thought Dr. Siepser's bill complied with the new engagement letter, but, by his own testimony, he has no recollection of focusing on the issue of whether or not the new terms of engagement allowing premium billing applied to that client. It is under these facts, in combination with those summarized above, that we review the issue of whether the respondent violated Rule 8.4(c).

## V. Legal Analysis

■ We turn first to the legal question of whether the facts supported by the record establish that the respondent acted knowingly or recklessly in charging Dr. Siepser and SHC a premium to which McDermott was not entitled. With respect to whether the respondent acted knowingly, we conclude, as did the Board, that Bar Counsel failed to establish by clear and convincing evidence that he did. Multiple witnesses testified that confusion regarding the applicable billing policy was possible given the changes being implemented at McDermott. This testimony supports the respondent's repeated statements that he had no intent to act dishonestly in charging a premium. While knowledge may be shown by circumstantial evidence, Bar Counsel has failed to present sufficient facts to meet its burden of proof on that point. *Cf. In re Starnes,* 829 A.2d 488, 500 (D.C.2003) (per curiam) (adopting the Board's conclusion that the circumstantial evidence presented was sufficient to prove an attorney's state of mind in the absence of more direct proof). We therefore focus our analysis on whether, as a matter of law, the respondent's actions were reckless—an issue that we find troublingly close.

To show recklessness, Bar Counsel must prove by clear and convincing evidence that the respondent "consciously disregarded the risk," *Anderson, supra,* 778 A.2d at 339, that he was charging his clients a premium to which his firm was not entitled. *See also Romansky I, supra,* 825 A.2d at 316 (quoting *Black's Law Dictionary* 1277 (7th ed.1999) (defining recklessness as a "state of mind in which a person does not care about the consequences of his or her action")). Certainly,

a plausible argument can be made that the evidence presented to the Hearing Committee satisfied this burden.

The respondent himself testified that he did not recall focusing on the terms of McDermott's engagement letter with Dr. Siepser when he charged the premium now at issue despite the recent vintage of the change in billing policy which should have acted to trigger his concern about this question. On the contrary, while he conceded that the new engagement letters did not govern the billing relationship with these clients, he admitted that at the time of his modifications to their bills, he had no recollection of even considering the issue of whether the old or the new engagement letter might be applicable to SHC. His ignorance of the specific terms governing the billing of these clients, however, combined with his lack of any effort to ascertain their content, could support a conclusion that he "consciously disregarded the risk" that he might be improperly charging his client a premium.[10] *Anderson, supra,* 778 A.2d at 339.[11]

On the other hand, the respondent points to several facts in support of his assertion that his actions "are consistent with a good faith mistake and inconsistent with dishonest intent." These findings include: (1) that McDermott had recently changed its billing polices; (2) that the bills at issue in this case were sent out shortly after the firm adopted its new form engagement letter; (3) that two firm attorneys testified that these circumstances could have caused confusion as to which policy applied to the Siepser and SHC matters; and (4) that the respondent was responsible for an unusually large number of bills totaling millions of dollars. We agree that these findings could be viewed as weighing against a conclusion that the respondent acted with dishonest intent.

Alternatively, however, the same findings could be viewed as supporting a conclusion that the respondent's conduct was reckless and therefore dishonest. He was indisputably aware of the recent change in billing practices and was responsible for the monthly billing of a large number of clients. Yet, despite these unique circumstances that significantly increased the likelihood of a billing error, he never checked to be sure that Dr. Siepser and SHC had been notified of and assented to the change in billing practices. In fact, he admittedly never focused on or even considered the content of the applicable engagement letters, but at best, *assumed* that he could charge these clients a premium without taking the time—or asking anyone else to take the time—to confirm his assumption about the written terms of the applicable engagement letters. The respondent's willful ignorance of their con-

---

10. The respondent points out that he had written off hours charged to SHC on previous bills. There are many reasons why hours might be written off, and that fact, at least in the context here, is not relevant to the question of whether the respondent violated Rule 8.4(c). Evidence referred to by Bar Counsel concerning unrelated charges of hour-padding are also irrelevant to the claims presently before us.

11. The present case is analogous to *In re Rivlin,* 856 A.2d 1086, 1096 (D.C.2004). There, we adopted the Board's conclusion that *Rivlin* had intentionally misappropriated funds entrusted to him by a client after placing those funds in a trust account that also contained personal funds. The Board further found that "[t]he evidence also support[ed] the Hearing Committee's conclusion that Respondent's misappropriations were at least reckless in that he wrote checks on his [trust account] regardless of whether he was using client funds or no funds." *Id.* Similarly, the respondent in this case charged SHC a premium for McDermott's services without any attention whatsoever to the billing agreement that existed between the firm and its client.

tent would support a conclusion that the respondent acted in conscious disregard of a readily apparent risk that he would be charging the premium without the knowledge and consent of his clients, and that he had therefore acted recklessly pursuant to Rule 8.4(c).

In the end the question is whether we can conclude by "clear and convincing" evidence that the recklessness standard has been met. Because we view the facts as virtually in equipoise, we cannot conclude that it has been shown by the requisite "clear and convincing" evidence that the respondent was reckless rather than negligent. Accordingly, we do not find that the respondent's actions with respect to the bills of either Dr. Siepser or SHC were dishonest and in violation of Rule 8.4(c).

## VI. Sanction

■ We turn to consider the sanction recommended by the Board with respect to the FASA and OOSS matters, which we refrained from deciding in *Romansky I* because the full scope of respondent's ethical violations had not yet been determined. In its initial Report, the Board recommended a thirty-day suspension for the FASA matter and stated that its recommendation would be the same if the OOSS matter also were found to be a Rule 8.4(c) violation. On remand, the Board has adhered to its recommendation of a thirty-day suspension for the two violations. After identifying aggravating and mitigating factors present in this case,[12] the Board states:

> The disciplinary system takes a dim view of lawyers' involvement in the creation of false and misleading documents. *See, e.g., [In re Bikoff,* 748 A.2d [915,]] 915 (D.C.1995) (per curiam) (60 days' suspension for dishonest misclassification of expenses in bills to client); *In re Phillips,* 705 A.2d 690 (D.C.1998) (per curiam) (60 days' suspension for filing false petition in court); *In re Zeiger,* 692 A.2d 1351 (D.C.1997) (per curiam) (60 days' suspension for submitting altered medical records to opposing party's insurer); *In re Schneider,* 553 A.2d 206 (D.C.1989) (30 days' suspension for altering receipts for reimbursement purposes); *In re Hadzi–Antich,* 497 A.2d 1062 (D.C.1985) (public censure for misstating class rank in resume in order to obtain employment). The principal violation in this case, the FASA matter, is serious; Respondent abused his position of trust with a client, including the client's clerical staff, to attempt to deceive his partners and law firm management through the creation of misleading documentation for his work.

> On balance, however, the Board does not perceive the violation in this case to be as serious as the violations in *Bikoff, Phillips,* and *Zeiger.* The violations in *Bikoff* took place over a four-year period, reflected a deeply ingrained practice on the part of the attorney, and involved more than $100,000 in billing. The principal violation in this case, by contrast,

---

12. The Board's report describes the aggravating and mitigating factors as follows:

The principal aggravating factor is that Respondent was a highly experienced lawyer who clearly should have known better than to misleadingly direct a client's secretary to write a document that was improperly backdated and contrary to prior arrangement with the client, lie to the firm about the circumstances of the document's creation, lie to the client about the circumstances of the firm's use of the document, and direct an associate to record time improperly. Mitigating factors are that (a) Respondent exhibited remorse; (b) he cooperated with Bar Counsel; and (c) he has an otherwise unblemished record.

took place over about two weeks, was in essence a one-time incident, and was the result of panic. Unlike *Phillips* and *Zeiger*, this case did not involve an attempt to secure an advantage over an opposing party in litigation or in negotiations over a transaction, which would make the matter considerably more aggravated. And while the FASA case does implicate dishonesty involving a client rather than a purely internal law firm matter—which is one of the principal reasons why the Board recommends a suspensory sanction rather than a censure—it does not involve an attempt to secure funds from a client, given that we have found no dishonesty in the Siepser and Surgical Health matters. While we have no precise metric to dictate the proper result in this case, the Board adheres to its recommendation of a 30–day suspension.

 The determination of an appropriate sanction requires the Board and this court to consider the nature of the respondent's ethical violations; any mitigating and aggravating circumstances; the need to protect the public, the courts, and the legal profession; and the moral fitness of the attorney. *In re Hutchinson*, 534 A.2d 919, 924 (D.C.1987). "In all cases, our purpose in imposing discipline is to serve the public and professional interests we have identified, rather than to visit punishment upon an attorney." *In re Reback*, 513 A.2d 226, 231 (D.C.1986) (en banc).

 "A sanction recommended by the Board on Professional Responsibility comes to us with a strong presumption in favor of its imposition." *In re Austin*, 858 A.2d 969, 975 (D.C.2004). D.C. Bar Rule XI, § 9(g) obliges us to "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." As we have explained, this rule

endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise. The rule requires that we enforce a general sense of equality in the sanctions handed out, but it otherwise commands that we should respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable.

*In re Hutchinson, supra,* 534 A.2d at 924 (quoting *In re Haupt,* 422 A.2d 768, 771 (D.C.1980)). Thus, "[g]enerally speaking, if the Board's recommended sanction falls within the wide range of acceptable outcomes, it will be adopted and imposed." *Austin,* 858 A.2d at 975.

While the author of this opinion would opt to suspend respondent for sixty days, for reasons set forth in a separate statement appended to this opinion, the majority of this panel is persuaded by the Board's reasoning and is satisfied to defer to its sanction recommendation. The majority notes that a thirty-day suspension is within the "wide range" of sanctions that have been imposed for the dishonest submission of false documents. *See In re Uchendu,* 812 A.2d 933, 941–42 (D.C.2002) (citing cases). Moreover, considering the unusual facts of this case, the majority is not prepared to say that the Board has misapprehended the seriousness of respondent's misconduct or abused its discretion. Accordingly, it is

ORDERED that Michael A. Romansky be, and hereby is, suspended from the practice of law for thirty days.

*So ordered.*

KRAMER, *Associate Judge,* writing separately with respect to Section VI.

While my colleagues consider deference to the Board's recommendation as the

proper course in this case, I cannot agree. As Bar Counsel, who recommends a six-month sanction, has argued, the respondent engaged in deceptive and dishonest actions relating to his practice of law, in one instance formulating and submitting a forged letter to assist respondent in the internal investigation of his billing practices (the FASA matter), and in the other assigning an associate to work on a matter for his father and then instructing her to bill the time to another client's account (the OOSS matter). As we concluded in *Romansky I*, these actions violated Rule 8.4(c). Moreover, they went to the heart of the attorney/client relationship, breaching the duty that an attorney owes to his clients, that is, "to give [them] the benefit of his best ... exertions," and not to "permit[] ... his own personal interest [to] conflict with that duty by securing [or attempting to secure] a benefit to himself." *Bruce's Ex'x v. Bibb's Ex'x,* 129 Va. 45, 105 S.E. 570, 571 (1921).

While we found the evidence with respect to his "premium" billing for hours that were not worked in the Siepser and SHC matter insufficient to meet the recklessness standard, we did conclude that his actions were negligent. Moreover, as Bar Counsel points out, we are not dealing with some young, unseasoned attorney, but one who at the time of the actions underlying this matter had practiced law for fifteen years at his firm, was a leader in the health care practice group, and was an important and influential partner with major billing responsibilities. As Bar Counsel argued, attorneys with such authority have an obligation not only to their firm and their clients, but also to the legal profession "to be scrupulous about billing matters, both because of the amounts of client funds involved in their practices and because of their need to set examples for other lawyers."

While "[a] sanction recommended by the Board ... comes to us with a strong presumption in favor of its imposition," *In re Austin,* 858 A.2d 969, 975 (D.C.2004) (citing *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987)), the court need not adopt the recommended disposition if it would be "unwarranted." D.C.Bar. R. XI, § 9(g). Violations in two of our previous cases involving dishonesty, *In re Phillips,* 705 A.2d 690, 691 (D.C.1998), and *In re Zeiger,* 692 A.2d 1351, 1352 (D.C.1997), both involving attorney violations of Rule 8.4, are analogous to the violations here. In *Phillips,* the attorney was suspended for sixty days for filing a false and misleading petition in federal court. In *Zeiger,* the attorney was suspended for sixty days for submitting altered medical records to an opposing party's insurer.

In my view a sanction of thirty days is unduly modest and thus "unwarranted" in light of the respondent's actions in this matter. Given the tension, however, between the Board's view and that of Bar Counsel, sixty days is the sanction that I would impose.